# GUSTAFSON ET AL. v. ALLOYD CO., INC., FKA ALLOYD HOLDINGS, INC., ET AL.

No. 93–404.   Argued November 2, 1994—Decided February 28, 1995

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, and SOUTER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA, GINSBURG, and BREYER, JJ., joined, *post*, p. 584. GINSBURG, J., filed a dissenting opinion, in which BREYER, J., joined, *post*, p. 596.

*Donald W. Jenkins* argued the cause for petitioners. With him on the briefs were *Harold C. Wheeler, Debra A. Winiarski, Thomas P. Desmond,* and *Jennifer R. Evans.*

*Robert J. Kopecky* argued the cause for respondents. With him on the brief were *Brian D. Sieve, Kenneth W. Starr,* and *Paul T. Cappuccio.*

*Michael R. Dreeben* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days, Deputy Solicitor General Kneedler, Simon M. Lorne, Paul*

Gonson, Jacob H. Stillman, Brian D. Bellardo, and Mark Pennington.*

JUSTICE KENNEDY delivered the opinion of the Court.

Under § 12(2) of the Securities Act of 1933 buyers have an express cause of action for rescission against sellers who make material misstatements or omissions "by means of a prospectus." The question presented is whether this right of rescission extends to a private, secondary transaction, on the theory that recitations in the purchase agreement are part of a "prospectus."

I

Petitioners Gustafson, McLean, and Butler (collectively Gustafson) were in 1989 the sole shareholders of Alloyd, Inc., a manufacturer of plastic packaging and automatic heat sealing equipment. Alloyd was formed, and its stock was issued, in 1961. In 1989, Gustafson decided to sell Alloyd and engaged KPMG Peat Marwick to find a buyer. In response to information distributed by KPMG, Wind Point Partners II, L. P., agreed to buy substantially all of the issued and outstanding stock through Alloyd Holdings, Inc., a new corporation formed to effect the sale of Alloyd's stock. The shareholders of Alloyd Holdings were Wind Point and a number of individual investors.

In preparation for negotiating the contract with Gustafson, Wind Point undertook an extensive analysis of the company, relying in part on a formal business review prepared by

---

*Robert L. Schnell, Jr., Wendy J. Wildung, and Stuart J. Kaswell filed a brief for the Securities Industry Association, Inc., as amicus curiae urging reversal.

Patrick E. Cafferty and Jonathan W. Cuneo filed a brief for the National Association of Securities and Commercial Law Attorneys as amicus curiae urging affirmance.

Karen M. O'Brien filed a brief for North American Securities Administrators Association, Inc., as amicus curiae.

KPMG. Alloyd's practice was to take inventory at year's end, so Wind Point and KPMG considered taking an earlier inventory to use in determining the purchase price. In the end they did not do so, relying instead on certain estimates and including provisions for adjustments after the transaction closed.

On December 20, 1989, Gustafson and Alloyd Holdings executed a contract of sale. Alloyd Holdings agreed to pay Gustafson and his coshareholders $18,709,000 for the sale of the stock plus a payment of $2,122,219, which reflected the estimated increase in Alloyd's net worth from the end of the previous year, the last period for which hard financial data were available. Article IV of the purchase agreement, entitled "Representations and Warranties of the Sellers," included assurances that the company's financial statements "present fairly . . . the Company's financial condition" and that between the date of the latest balance sheet and the date the agreement was executed "there ha[d] been no material adverse change in . . . [Alloyd's] financial condition." App. 115, 117. The contract also provided that if the year-end audit and financial statements revealed a variance between estimated and actual increased value, the disappointed party would receive an adjustment.

The year-end audit of Alloyd revealed that Alloyd's actual earnings for 1989 were lower than the estimates relied upon by the parties in negotiating the adjustment amount of $2,122,219. Under the contract, the buyers had a right to recover an adjustment amount of $815,000 from the sellers. Nevertheless, on February 11, 1991, the newly formed company (now called Alloyd Co., the same as the original company) and Wind Point brought suit in the United States District Court for the Northern District of Illinois, seeking outright rescission of the contract under § 12(2) of the Securities Act of 1933 (1933 Act or Act). Alloyd (the new company) claimed that statements made by Gustafson and his coshareholders regarding the financial data of their company

were inaccurate, rendering untrue the representations and warranties contained in the contract. The buyers further alleged that the contract of sale was a "prospectus," so that any misstatements contained in the agreement gave rise to liability under § 12(2) of the 1933 Act. Pursuant to the adjustment clause, the defendants remitted to the purchasers $815,000 plus interest, but the adjustment did not cause the purchasers to drop the lawsuit.

Relying on the decision of the Court of Appeals for the Third Circuit in *Ballay* v. *Legg Mason Wood Walker, Inc.*, 925 F. 2d 682 (1991), the District Court granted Gustafson's motion for summary judgment, holding "that section 12(2) claims can only arise out of the initial stock offerings." App. 20. Although the sellers were the controlling shareholders of the original company, the District Court concluded that the private sale agreement "cannot be compared to an initial offering" because "the purchasers in this case had direct access to financial and other company documents, and had the opportunity to inspect the seller's property." *Id.*, at 21.

On review, the Court of Appeals for the Seventh Circuit vacated the District Court's judgment and remanded for further consideration in light of that court's intervening decision in *Pacific Dunlop Holdings Inc.* v. *Allen & Co. Inc.*, 993 F. 2d 578 (1993). In *Pacific Dunlop* the court reasoned that the inclusion of the term "communication" in the Act's definition of prospectus meant that the term "prospectus" was defined "very broadly" to include all written communications that offered the sale of a security. *Id.*, at 582. Rejecting the view of the Court of Appeals for the Third Circuit in *Ballay*, the Court of Appeals decided that § 12(2)'s right of action for rescission "applies to any communication which offers any security for sale . . . including the stock purchase agreement in the present case." 993 F. 2d, at 595. We granted certiorari to resolve this Circuit conflict, 510 U. S. 1176 (1994), and we now reverse.

## II

The rescission claim against Gustafson is based upon § 12(2) of the 1933 Act, 48 Stat. 84, as amended, 15 U. S. C. § 77*l*(2). In relevant part, the section provides that any person who

"offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

"shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

As this case reaches us, we must assume that the stock purchase agreement contained material misstatements of fact made by the sellers and that Gustafson would not sustain its burden of proving due care. On these assumptions, Alloyd would have a right to obtain rescission if those misstatements were made "by means of a prospectus or oral communication." The Courts of Appeals agree that the phrase "oral communication" is restricted to oral communications

that relate to a prospectus. See *Pacific Dunlop, supra,* at 588; *Ballay, supra,* at 688. The determinative question, then, is whether the contract between Alloyd and Gustafson is a "prospectus" as the term is used in the 1933 Act.

Alloyd argues that "prospectus" is defined in a broad manner, broad enough to encompass the contract between the parties. This argument is echoed by the dissents. See *post,* at 585–586 (opinion of THOMAS, J.); *post,* at 596 (opinion of GINSBURG, J.). Gustafson, by contrast, maintains that prospectus in the 1933 Act means a communication soliciting the public to purchase securities from the issuer. Brief for Petitioners 17–18.

Three sections of the 1933 Act are critical in resolving the definitional question on which the case turns: § 2(10), which defines a prospectus; § 10, which sets forth the information that must be contained in a prospectus; and § 12, which imposes liability based on misstatements in a prospectus. In seeking to interpret the term "prospectus," we adopt the premise that the term should be construed, if possible, to give it a consistent meaning throughout the Act. That principle follows from our duty to construe statutes, not isolated provisions. See *Philbrook* v. *Glodgett,* 421 U. S. 707, 713 (1975); *Kokoszka* v. *Belford,* 417 U. S. 642, 650 (1974).

### A

We begin with § 10. It provides, in relevant part:

> "Except to the extent otherwise permitted or required pursuant to this subsection or subsections (c), (d), or (e) of this section—
>
> "(1) a prospectus relating to a security other than a security issued by a foreign government or political subdivision thereof, shall contain the information contained in the registration statement . . . ;
>
> "(2) a prospectus relating to a security issued by a foreign government or political subdivision thereof shall

contain the information contained in the registration statement . . . ."   15 U. S. C. § 77j(a).

Section 10 does not provide that some prospectuses must contain the information contained in the registration statement.   Save for the explicit and well-defined exemptions for securities listed under § 3, see 15 U. S. C. § 77c (exempting certain classes of securities from the coverage of the Act), its mandate is unqualified: "[A] prospectus . . . shall contain the information contained in the registration statement."

Although § 10 does not define what a prospectus is, it does instruct us what a prospectus cannot be if the Act is to be interpreted as a symmetrical and coherent regulatory scheme, one in which the operative words have a consistent meaning throughout.   There is no dispute that the contract in this case was not required to contain the information contained in a registration statement and that no statutory exemption was required to take the document out of § 10's coverage.   Cf. 15 U. S. C. § 77c.   It follows that the contract is not a prospectus under § 10.   That does not mean that a document ceases to be a prospectus whenever it omits a required piece of information.   It does mean that a document is not a prospectus within the meaning of that section if, absent an exemption, it need not comply with § 10's requirements in the first place.

An examination of § 10 reveals that, whatever else "prospectus" may mean, the term is confined to a document that, absent an overriding exemption, must include the "information contained in the registration statement."   By and large, only public offerings by an issuer of a security, or by controlling shareholders of an issuer, require the preparation and filing of registration statements.   See 15 U. S. C. §§ 77d, 77e, 77b(11).   It follows, we conclude, that a prospectus under § 10 is confined to documents related to public offerings by an issuer or its controlling shareholders.

This much (the meaning of prospectus in § 10) seems not to be in dispute.   Where the courts are in disagreement is

with the implications of this proposition for the entirety of the Act, and for § 12 in particular. Compare *Ballay* v. *Legg Mason Wood Walker, Inc.*, 925 F. 2d, at 688–689 (suggesting that the term "prospectus" is used in a consistent manner in both §§ 10 and 12), with *Pacific Dunlop Holdings Inc.* v. *Allen & Co.*, 993 F. 2d, at 584 (rejecting that view). We conclude that the term "prospectus" must have the same meaning under §§ 10 and 12. In so holding, we do not, as the dissent by JUSTICE GINSBURG suggests, make the mistake of treating § 10 as a definitional section. See *post,* at 597. Instead, we find in § 10 guidance and instruction for giving the term a consistent meaning throughout the Act.

The 1933 Act, like every Act of Congress, should not be read as a series of unrelated and isolated provisions. Only last Term we adhered to the "normal rule of statutory construction" that "identical words used in different parts of the same act are intended to have the same meaning." *Department of Revenue of Ore.* v. *ACF Industries, Inc.*, 510 U. S. 332, 342 (1994) (internal quotation marks and citations omitted); see also *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U. S. 209, 230 (1993); *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427, 433 (1932). That principle applies here. If the contract before us is not a prospectus for purposes of § 10—as all must and do concede—it is not a prospectus for purposes of § 12 either.

The conclusion that prospectus has the same meaning, and refers to the same types of communications (public offers by an issuer or its controlling shareholders), in both §§ 10 and 12 is reinforced by an examination of the structure of the 1933 Act. Sections 4 and 5 of the Act together require a seller to file a registration statement and to issue a prospectus for certain defined types of sales (public offerings by an issuer, through an underwriter). See 15 U. S. C. §§ 77d, 77e. Sections 7 and 10 of the Act set forth the information required in the registration statement and the prospectus.

See §§ 77g, 77j. Section 11 provides for liability on account of false registration statements; § 12(2) for liability based on misstatements in prospectuses. See 15 U. S. C. §§ 77k, 77l. Following the most natural and symmetrical reading, just as the liability imposed by § 11 flows from the requirements imposed by §§ 5 and 7 providing for the filing and content of registration statements, the liability imposed by § 12(2) cannot attach unless there is an obligation to distribute the prospectus in the first place (or unless there is an exemption).

Our interpretation is further confirmed by a reexamination of § 12 itself. The section contains an important guide to the correct resolution of the case. By its terms, § 12(2) exempts from its coverage prospectuses relating to the sales of government-issued securities. See 15 U. S. C. § 77l (excepting securities exempted by § 77c(a)(2)). If Congress intended § 12(2) to create liability for misstatements contained in any written communication relating to the sale of a security—including secondary market transactions—there is no ready explanation for exempting government-issued securities from the reach of the right to rescind granted by § 12(2). Why would Congress grant immunity to a private seller from liability in a rescission suit for no reason other than that the seller's misstatements happen to relate to securities issued by a governmental entity? No reason is apparent. The anomaly disappears, however, when the term "prospectus" relates only to documents that offer securities sold to the public by an issuer. The exemption for government-issued securities makes perfect sense on that view, for it then becomes a precise and appropriate means of giving immunity to governmental authorities.

The primary innovation of the 1933 Act was the creation of federal duties—for the most part, registration and disclosure obligations—in connection with public offerings. See, e. g., *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 195 (1976) (the 1933 Act "was designed to provide investors with full disclosure of material information concerning public offerings");

*Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 752 (1975) ("The 1933 Act is a far narrower statute [than the Securities Exchange Act of 1934 (1934 Act)] chiefly concerned with disclosure and fraud in connection with offerings of securities—primarily, as here, initial distributions of newly issued stock from corporate issuers"); *United States* v. *Naftalin,* 441 U. S. 768, 777–778 (1979) ("[T]he 1933 Act was primarily concerned with the regulation of new offerings"); *SEC* v. *Ralston Purina Co.,* 346 U. S. 119, 122, n. 5 (1953) ("'[T]he bill does not affect transactions beyond the need of public protection in order to prevent recurrences of demonstrated abuses'"), quoting H. R. Rep. No. 85, 73d Cong., 1st Sess., 7 (1933). We are reluctant to conclude that § 12(2) creates vast additional liabilities that are quite independent of the new substantive obligations the Act imposes. It is more reasonable to interpret the liability provisions of the 1933 Act as designed for the primary purpose of providing remedies for violations of the obligations it had created. Indeed, §§ 11 and 12(1)—the statutory neighbors of § 12(2)— afford remedies for violations of those obligations. See § 11, 15 U. S. C. § 77k (remedy for untrue statements in registration statements); § 12(1), 15 U. S. C. § 77*l*(1) (remedy for sales in violation of § 5, which prohibits the sale of unregistered securities). Under our interpretation of "prospectus," § 12(2) in similar manner is linked to the new duties created by the Act.

On the other hand, accepting Alloyd's argument that any written offer is a prospectus under § 12 would require us to hold that the word "prospectus" in § 12 refers to a broader set of communications than the same term in § 10. The Court of Appeals was candid in embracing that conclusion: "[T]he 1933 Act contemplates many definitions of a prospectus. Section 2(10) gives a single, broad definition; section 10(a) involves an isolated, distinct document—a prospectus within a prospectus; section 10(d) gives the Commission authority to classify many." *Pacific Dunlop Holdings Inc.* v.

*Allen & Co.*, 993 F. 2d, at 584. The dissents take a similar tack. In the name of a plain meaning approach to statutory interpretation, the dissents discover in the Act two different species of prospectuses: formal (also called § 10) prospectuses, subject to both §§ 10 and 12, and informal prospectuses, subject only to § 12 but not to § 10. See *post*, at 598–599 (opinion of GINSBURG, J.); see also *post*, at 588–589 (opinion of THOMAS, J.). Nowhere in the statute, however, do the terms "formal prospectus" or "informal prospectus" appear. Instead, the Act uses one term—"prospectus"—throughout. In disagreement with the Court of Appeals and the dissenting opinions, we cannot accept the conclusion that this single operative word means one thing in one section of the Act and something quite different in another. The dissenting opinions' resort to terms not found in the Act belies the claim of fidelity to the text of the statute.

Alloyd, as well as JUSTICE THOMAS in his dissent, respond that if Congress had intended § 12(2) to govern only initial public offerings, it would have been simple for Congress to have referred to the § 4 exemptions in § 12(2). See Brief for Respondents 25–26; *post*, at 590 (THOMAS, J., dissenting). The argument gets the presumption backwards. Had Congress meant the term "prospectus" in § 12(2) to have a different meaning than the same term in § 10, that is when one would have expected Congress to have been explicit. Congressional silence cuts against, not in favor of, Alloyd's argument. The burden should be on the proponents of the view that the term "prospectus" means one thing in § 12 and another in § 10 to adduce strong textual support for that conclusion. And Alloyd adduces none.

B

Alloyd's contrary argument rests to a significant extent on § 2(10), or, to be more precise, on one word of that section. Section 2(10) provides that "[t]he term 'prospectus' means any prospectus, notice, circular, advertisement, letter, or

communication, written or by radio or television, which offers any security for sale or confirms the sale of any security." 15 U. S. C. § 77b(10). Concentrating on the word "communication," Alloyd argues that any written communication that offers a security for sale is a "prospectus." Inserting its definition into § 12(2), Alloyd insists that a material misstatement in any communication offering a security for sale gives rise to an action for rescission, without proof of fraud by the seller or reliance by the purchaser. In Alloyd's view, § 2(10) gives the term "prospectus" a capacious definition that, although incompatible with § 10, nevertheless governs in § 12.

The flaw in Alloyd's argument, echoed in the dissenting opinions, *post*, at 587 (opinion of THOMAS, J.); *post*, at 597 (opinion of GINSBURG, J.), is its reliance on one word of the definitional section in isolation. To be sure, § 2(10) defines a prospectus as, *inter alia*, a "communication, written or by radio or television, which offers any security for sale or confirms the sale of any security." 15 U. S. C. § 77b(10). The word "communication," however, on which Alloyd's entire argument rests, is but one word in a list, a word Alloyd reads altogether out of context.

The relevant phrase in the definitional part of the statute must be read in its entirety, a reading which yields the interpretation that the term "prospectus" refers to a document soliciting the public to acquire securities. We find that definition controlling. Alloyd's argument that the phrase "communication, written or by radio or television," transforms any written communication offering a security for sale into a prospectus cannot consist with at least two rather sensible rules of statutory construction. First, the Court will avoid a reading which renders some words altogether redundant. See *United States* v. *Menasche*, 348 U. S. 528, 538–539 (1955). If "communication" included every written communication, it would render "notice, circular, advertisement, [and] letter" redundant, since each of these are forms of writ-

ten communication as well. Congress with ease could have drafted § 2(10) to read: "The term 'prospectus' means any communication, written or by radio or television, that offers a security for sale or confirms the sale of a security." Congress did not write the statute that way, however, and we decline to say it included the words "notice, circular, advertisement, [and] letter" for no purpose.

The constructional problem is resolved by the second principle Alloyd overlooks, which is that a word is known by the company it keeps (the doctrine of *noscitur a sociis*). This rule we rely upon to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving "unintended breadth to the Acts of Congress." *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961). The rule guided our earlier interpretation of the word "security" under the 1934 Act. The 1934 Act defines the term "security" to mean, *inter alia*, "any note." We concluded, nevertheless, that in context "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the background of what Congress was attempting to accomplish in enacting the Securities Acts." *Reves* v. *Ernst & Young*, 494 U. S. 56, 63 (1990). These considerations convince us that Alloyd's suggested interpretation is not the correct one.

There is a better reading. From the terms "prospectus, notice, circular, advertisement, [or] letter," it is apparent that the list refers to documents of wide dissemination. In a similar manner, the list includes communications "by radio or television," but not face-to-face or telephonic conversations. Inclusion of the term "communication" in that list suggests that it too refers to a public communication.

When the 1933 Act was drawn and adopted, the term "prospectus" was well understood to refer to a document soliciting the public to acquire securities from the issuer. See Black's Law Dictionary 959 (2d ed. 1910) (defining "prospectus" as a "document published by a company . . . or by per-

sons acting as its agents or assignees, setting forth the nature and objects of an issue of shares . . . and inviting the public to subscribe to the issue"). In this respect, the word "prospectus" is a term of art, which accounts for congressional confidence in employing what might otherwise be regarded as a partial circularity in the formal, statutory definition. See 15 U. S. C. § 77b(10) ("The term 'prospectus' means any prospectus . . ."). The use of the term "prospectus" to refer to public solicitations explains as well Congress' decision in § 12(2) to grant buyers a right to rescind without proof of reliance. See H. R. Rep. No. 85, 73d Cong., 1st Sess., 10 (1933) ("The statements for which [liable persons] are responsible, although they may never actually have been seen by the prospective purchaser, because of their wide dissemination, determine the market price of the security . . .").

The list of terms in § 2(10) prevents a seller of stock from avoiding liability by calling a soliciting document something other than a prospectus, but it does not compel the conclusion that Alloyd urges us to reach and that the dissenting opinions adopt. Instead, the term "written communication" must be read in context to refer to writings that, from a functional standpoint, are similar to the terms "notice, circular, [and] advertisement." The term includes communications held out to the public at large but that might have been thought to be outside the other words in the definitional section.

## C

Our holding that the term "prospectus" relates to public offerings by issuers and their controlling shareholders draws support from our earlier decision interpreting the one provision of the Act that extends coverage beyond the regulation of public offerings, § 17(a) of the 1933 Act.* See *United*

---

*Section 17(a) provides:
"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or com-

*States* v. *Naftalin*, 441 U. S. 768 (1979). In *Naftalin*, though noting that "the 1933 Act was primarily concerned with the regulation of new offerings," the Court held that § 17(a) was "intended to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading." The Court justified this holding—which it termed "a major departure from th[e] limitation [of the 1933 Act to new offerings]"—by reference to both the statutory language and the unambiguous legislative history. *Id.*, at 777–778. The same considerations counsel in favor of our interpretation of § 12(2).

The Court noted in *Naftalin* that § 17(a) contained no language suggesting a limitation on the scope of liability under § 17(a). See *id.*, at 778 ("[T]he statutory language . . . makes no distinctions between the two kinds of transactions"). Most important for present purposes, § 17(a) does not contain the word "prospectus." In contrast, as we have noted, § 12(2) contains language, *i. e.*, "by means of a prospectus or oral communication," that limits § 12(2) to public offerings. Just as the absence of limiting language in § 17(a) resulted in broad coverage, the presence of limiting language in § 12(2) requires a narrow construction.

Of equal importance, the legislative history relied upon in *Naftalin* showed that Congress decided upon a deliberate departure from the general scheme of the Act in this one instance, and "made abundantly clear" its intent that § 17(a) have broad coverage. See *ibid.* (quoting legislative history

---

munication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U. S. C. § 77q(a).

stating that "'fraud or deception in the sale of securities may be prosecuted regardless of whether . . . or not it is of the class of securities exempted under sections 11 or 12,'" S. Rep. No. 47, 73d Cong., 1st Sess., 4 (1933)). No comparable legislative history even hints that § 12(2) was intended to be a freestanding provision effecting expansion of the coverage of the entire statute. The intent of Congress and the design of the statute require that § 12(2) liability be limited to public offerings.

## D

It is understandable that Congress would provide buyers with a right to rescind, without proof of fraud or reliance, as to misstatements contained in a document prepared with care, following well-established procedures relating to investigations with due diligence and in the context of a public offering by an issuer or its controlling shareholders. It is not plausible to infer that Congress created this extensive liability for every casual communication between buyer and seller in the secondary market. It is often difficult, if not altogether impractical, for those engaged in casual communications not to omit some fact that would, if included, qualify the accuracy of a statement. Under Alloyd's view any casual communication between buyer and seller in the aftermarket could give rise to an action for rescission, with no evidence of fraud on the part of the seller or reliance on the part of the buyer. In many instances buyers in practical effect would have an option to rescind, impairing the stability of past transactions where neither fraud nor detrimental reliance on misstatements or omissions occurred. We find no basis for interpreting the statute to reach so far.

## III

The Securities and Exchange Commission (SEC), as *amicus*, and JUSTICE GINSBURG in dissent, rely on what they

call the legislative background of the Act to support Alloyd's construction. With a few minor exceptions, however, their reliance is upon statements by commentators and judges written after the Act was passed, not while it was under consideration. See Brief for SEC as *Amicus Curiae* 19–23; *post*, at 599–601 (GINSBURG, J., dissenting). Material not available to the lawmakers is not considered, in the normal course, to be legislative history. After-the-fact statements by proponents of a broad interpretation are not a reliable indicator of what Congress intended when it passed the law, assuming extratextual sources are to any extent reliable for this purpose.

The SEC does quote one contemporaneous memorandum prepared by Dean Landis. See Brief for SEC as *Amicus Curiae* 13–14 (citing James M. Landis, Reply to Investment Bankers Association Objections of May 5, 1933, p. 5). The statement is quite consistent with our construction. Landis observed that, in contrast to the liabilities imposed by the Act " 'that flow from the fact of non-registration or registration,' " dealings may violate § 12(2) " 'even though they are not related to the *fact* of registration.' " See Brief for SEC as *Amicus Curiae* 13 (emphasis added). This, of course, is true. The liability imposed by § 12(2) has nothing to do with the *fact* of registration, that is, with the failure to file a registration statement that complies with §§ 7 and 11 of the Act. Instead, the liability imposed by § 12(2) turns on misstatements contained in the prospectus. And, one might point out, securities exempted by § 3 of the Act do not require registration, although they are covered by § 12. Landis' observation has nothing to do with the question presented here: whether a prospectus is a document soliciting the public to purchase securities from the issuer.

The SEC also relies on a number of writings, the most prominent a release by the Federal Trade Commission, stating that § 12(2) applied to securities outstanding on the effective date of the 1933 Act. See *id.*, at 19–20. Again, this

is an issue not in dispute. Although the Act as passed exempted securities from registration if sold by the issuer within 60 days of the passage of the Act, see 1933 Securities Act, § 3(a)(1), the limitation did not apply to § 12(2). See 15 U. S. C. § 77*l*. Instead, actions brought under § 12(2) are subject to the limitation of actions provision in § 13. See 15 U. S. C. § 77m (one year from the date of discovery). A buyer who discovered a material omission in a prospectus after the passage of the Act could sue for rescission under § 12(2) even though the prospectus had been issued before enactment of the statute. This tells us nothing one way or the other, however, about whether the term "prospectus" is limited to a document soliciting the public to purchase securities from the issuer.

In large measure the writings on which both the SEC and JUSTICE GINSBURG rely address a question on which there is no disagreement, that is, "to what securities does § 12(2) apply?" We agree with the SEC that § 12(2) applies to every class of security (except one issued or backed by a governmental entity), whether exempted from registration or not, and whether outstanding at the time of the passage of the Act or not. The question before us is the coverage of § 12(2), and the writings offered by the SEC are of little value on this point.

If legislative history is to be considered, it is preferable to consult the documents prepared by Congress when deliberating. The legislative history of the Act concerning the precise question presented supports our interpretation with much clarity and force. Congress contemplated that § 12(2) would apply only to public offerings by an issuer (or a controlling shareholder). The House Report stated: "The bill affects only new offerings of securities . . . . It does not affect the ordinary redistribution of securities unless such redistribution takes on the characteristics of a new offering." H. R. Rep. No. 85, 73d Cong., 1st Sess., 5 (1933). The observation extended to § 12(2) as well. Part II, § 6 of the

House Report is entitled "Civil Liabilities." See *id.*, at 9. It begins: "Sections 11 and 12 create and define the civil liabilities imposed by the act . . . . Fundamentally, these sections entitle the buyer of securities sold upon a registration statement . . . to sue for recovery of his purchase price." *Ibid.* It will be recalled that as to private transactions, such as the Alloyd purchase, there will never have been a registration statement. If § 12(2) liability were imposed here, it would cover transactions not within the contemplated reach of the statute.

Even more important is the Report's discussion, and justification, of the liabilities arising from omissions and misstatements in "the prospectus":

> "The Committee emphasizes that these liabilities attach only when there has been an untrue statement of material fact or an omission to state a material fact in the registration statement or the prospectus—the basic information by which the public is solicited. All who sell securities with such a flaw, who cannot prove that they did not know—or who in the exercise of due care could not have known—of such misstatement or omission, are liable under sections 11 and 12. For those whose moral responsibility to the public is particularly heavy, there is a correspondingly heavier legal liability—the persons signing the registration statement, the underwriters, the directors of the issuer, the accountants, engineers, appraisers, and other professionals preparing and giving authority to the prospectus—all these are liable to the buyer . . . if they cannot prove [the use of due care]. This throws upon originators of securities a duty of competence as well as innocence . . . ." *Ibid.*

The House Report thus states with clarity and with specific reference to § 12 that § 12 liability is imposed only as to a document soliciting the public.

In light of the care that Congress took to justify the imposition of liability without proof of either fraud or reliance on "those whose moral responsibility to the public is particularly heavy"—the "originators of securities"—we cannot conclude that Congress would have extended that liability to every private or secondary sale without a whisper of explanation. The conspicuous absence in the legislative history is not the absence of an explicit statement that § 12(2) applied only to public offerings, see *post*, at 600 (GINSBURG, J., dissenting), but the lack of any explicit reference to the creation of liability for private transactions.

JUSTICE GINSBURG argues that the omission from the 1933 Act of the phrase "offering to the public" that appeared in the definition of "prospectus" in the British Companies Act of 1929 suggests that the drafters of the American bill intended to expand its coverage. See *post*, at 599–600 (dissenting opinion). We consider it more likely that the omission reflected instead the judgment that the words "offering to the public" were redundant in light of the understood meaning of "prospectus." Far from suggesting an intent to depart in a dramatic way from the balance struck in the British Companies Act, the legislative history suggests an intent to maintain it. In the context of justifying the "civil liabilities" provisions that hold "all those responsible for statements upon the face of which the public is solicited . . . to standards like those imposed by law upon a fiduciary," the House Report stated: "The demands of this bill call for the assumption of no impossible burden, nor do they involve any leap into the dark. Similar requirements have for years attended the business of issuing securities in other industrialized nations." H. R. Rep. No. 85, at 5. So, too, the Report provided: "The committee is fortified in these sections [that is, §§ 11 and 12] by similar safeguards in the English Companies Act of 1929. What is deemed necessary for sound financing in conservative England ought not be unnecessary

for the more feverish pace which American finance has developed." *Id.*, at 9. These passages confirm that the civil liability provisions of the 1933 Act, §§ 11 and 12, impose obligations on those engaged in "the business of issuing securities," in conformance, not in contradiction to, the British example.

Nothing in the legislative history, moreover, suggests Congress intended to create two types of prospectuses, a formal prospectus required to comply with both §§ 10 and 12, and a second, less formal prospectus, to which only § 12 would be applicable. The Act proceeds by definitions more stable and precise. The legislative history confirms what the text of the Act dictates: § 10's requirements govern all prospectuses defined by § 2(10) (although, as we pointed out earlier, certain classes of securities are exempted from § 10 by operation of § 3). In discussing § 10, the House Report stated:

> "Section 10 of the bill requires that any 'prospectus' used in connection with the sale of any securities, if it is more than a mere announcement of the name and price of the issue offered and an offer of full details upon request [the exception codified at § 2(10)(b)], must include a substantial portion of the information required in the 'registration statement.' . . .
>
> " 'Prospectus' is defined in section 2(1) [now § 2(10)] to include 'any prospectus, notice, circular, advertisement, letter, or other communication offering any security for sale.'
>
> "The purpose of these sections is to secure for potential buyers the means of understanding the intricacies of the transaction into which they are invited." *Id.*, at 8.

Nothing in the Report suggests that Congress thought that § 10 would apply only to formal prospectuses required to be produced by § 5. See 15 U. S. C. § 77e. Cf. *post*, at 589 (THOMAS, J., dissenting). The Report undermines the dis-

sents' self-contradicting conclusion that the contract here is a prospectus under § 2(10) even though not subject to the requirements of § 10.

*   *   *

In sum, the word "prospectus" is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder. The contract of sale, and its recitations, were not held out to the public and were not a prospectus as the term is used in the 1933 Act.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE SCALIA, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

From the majority's opinion, one would not realize that § 12(2) of the Securities Act of 1933 (1933 Act or Act) was involved in this case until one had read more than halfway through. In contrast to the majority's approach of interpreting the statute, I believe the proper method is to begin with the provision actually involved in this case, § 12(2), and then turn to the 1933 Act's definitional section, § 2(10), before consulting the structure of the Act as a whole. Because the result of this textual analysis shows that § 12(2) applies to secondary or private sales of a security as well as to initial public offerings, I dissent.

## I

### A

As we have emphasized in our recent decisions, " '[t]he starting point in every case involving construction of a statute is the language itself.' " *Landreth Timber Co.* v. *Landreth,* 471 U. S. 681, 685 (1985) (quoting *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (Powell, J.,

concurring)). See also *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 173–175 (1994). Unfortunately, the majority has decided to interpret the word "prospectus" in §12(2) by turning to sources outside the four corners of the statute, rather than by adopting the definition provided by Congress.

Section 12(2) creates a cause of action when the seller of a security makes a material omission or misstatement to the buyer by means of a prospectus or oral communication. If the seller acted negligently in making the misstatements, the buyer may sue to rescind the sale. I agree with the majority that the only way to interpret §12(2) as limited to initial offerings is to read "by means of a prospectus or oral communication" narrowly. I also agree that in the absence of any other statutory command, one could understand "prospectus" as "a term of art which describes the transmittal of information concerning the sale of a security in an initial distribution." But the canon that "we construe a statutory term in accordance with its ordinary or natural meaning" applies only "[i]n the absence of [a statutory] definition." *FDIC* v. *Meyer*, 510 U. S. 471, 476 (1994).

There is no reason to seek the meaning of "prospectus" outside of the 1933 Act, because Congress has supplied just such a definition in §2(10). That definition is extraordinarily broad:

> "When used in this subchapter, unless the context otherwise requires—
>
> .            .            .            .            .
>
> "(10) The term 'prospectus' means any prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security." 15 U. S. C. §77b(10).

For me, the breadth of these terms forecloses the majority's position that "prospectus" applies only in the context of ini-

tial distributions of securities. Indeed, § 2(10)'s inclusion of a prospectus as only one of the many different documents that qualify as a "prospectus" for statutory purposes indicates that Congress intended "prospectus" to be more than a mere "term of art." Likewise, Congress' extension of prospectus to include documents that merely *confirm* the sale of a security underscores Congress' intent to depart from the term's ordinary meaning. Section 2(10)'s definition obviously concerns different types of communications rather than different types of transactions. Congress left the job of exempting certain classes of transactions to §§ 3 and 4, not to § 2(10). We should use § 2(10) to define "prospectus" for the 1933 Act, rather than, as the majority does, use the 1933 Act to define "prospectus" for § 2(10).

The majority seeks to avoid this reading by attempting to create ambiguities in § 2(10). According to the majority, the maxim *noscitur a sociis* (a word is known by the company it keeps) indicates that the circulars, advertisements, letters, or other communications referred to by § 2(10) are limited by the first word in the list: "prospectus." Thus, we are told that these words define the forms a prospectus may take, but the covered communications still must be "prospectus-like" in the sense that they must relate to an initial public offering. *Noscitur a sociis,* however, does not require us to construe *every* term in a series narrowly because of the meaning given to just one of the terms. See *Russell Motor Car Co.* v. *United States,* 261 U. S. 514, 519 (1923); cf. *Reves* v. *Ernst & Young,* 494 U. S. 56, 64 (1990).

The majority uses the canon in an effort to *create* doubt, not to *reduce* it. The canon applies only in cases of ambiguity, which I do not find in § 2(10). "*Noscitur a sociis* is a well established and useful rule of construction where words are of obscure or doubtful meaning; and then, but only then, its aid may be sought to remove the obscurity or doubt by reference to the associated words." *Russell, supra,* at 520. There is obvious breadth in "notice, circular, advertisement,

letter, or communication, written or by radio or television." To read one word in a long list as controlling the meaning of all the other words would defy common sense; doing so would prevent Congress from giving effect to expansive words in a list whenever they are combined with one word with a more restricted meaning. Section 2(10)'s very exhaustiveness suggests that "prospectus" is merely the first item in a long list of covered documents, rather than a brooding omnipresence whose meaning cabins that of all the following words. The majority also argues that a broad definition of prospectus makes much of § 2(10) redundant. See *ante*, at 574–575. But the majority fails to see that "communication, written or by radio or television," is a catchall. It operates as a safety net that Congress used to sweep up anything it had forgotten to include in its definition. This is a technique Congress employed in several other provisions of the 1933 Act and the Securities Exchange Act of 1934 (1934 Act). See, *e. g.*, 15 U. S. C. § 77b(1) ("term 'security' means any note, stock, treasury stock, bond, debenture . . . or, in general, any interest or instrument commonly known as a 'security'"); § 77b(9) ("term 'write' or 'written' shall include printed, lithographed, or any means of graphic communication"); § 78c(a)(6) ("term 'bank' means (A) a banking institution organized under the laws of the United States, (B) a member bank of the Federal Reserve System, (C) any other banking institution"). In fact, it is the majority's approach that creates redundancies. The majority cannot account for Congress' decision to begin its definition of "prospectus" with the term "prospectus," which is then followed by the rest of § 2(10)'s list. As a result, the majority must conclude that the use of the term is a "partial circularity," *ante*, at 576, a reading that deprives the word of its meaning.

## B

The majority correctly argues that other sections of the 1933 Act employ a narrower understanding of "prospectus"

as a document related to an initial public offering. See § 10 of the 1933 Act, 15 U. S. C. § 77j(a)(3) (detailing information required in prospectus); § 5 of the 1933 Act, 15 U. S. C. § 77e(b) (requiring prospectus to be sent to buyers). In fact, the majority builds its entire argument on the proposition that it must give "prospectus" the same meaning in both §§ 10 and 12. Since § 10 assumes a narrower definition of prospectus, the majority believes that its definition must control that of § 12. Although the majority denies that it reads § 10 as a definitional section, it admits that § 10 "does instruct us what a prospectus cannot be if the Act is to be interpreted as a symmetrical and coherent regulatory scheme." *Ante,* at 569.

I agree with the majority that §§ 5 and 10 cannot embrace fully the broad definition of prospectus supplied by § 2(10) and used by § 12(2). I also recognize the general presumption that a given term bears the same meaning throughout a statute. See *Brown* v. *Gardner, ante,* at 118. But this presumption is overcome when Congress indicates otherwise. Here, there are several indications that Congress did not use the word "prospectus" in the same sense throughout the statute. First, § 2(10) defines "prospectus" to include not only a document that "offers any security for sale" (which is consistent with the majority's reading), but also one that "confirms the sale of any security." But the majority does not claim that § 10 uses the term "prospectus" to include confirmation slips. It would be radical to say that every confirmation slip must contain all the information that § 10 requires; only the documents accompanying an initial public offering must contain that information. Despite the majority's protestations, it is absolutely clear that the 1933 Act uses "prospectus" in two different ways. As a result, any justification for the majority's twisted reading of § 2(10) disappears.

Second, this understanding is reinforced by § 2's preface that its definitions apply "unless the context otherwise re-

quires," 15 U. S. C. § 77b. This phrase indicates that Congress intended simply to provide a "default" meaning for "prospectus." Further, nothing in § 12(2) indicates that the "context otherwise requires" the use of a definition of "prospectus" other than the one provided by § 2(10). If anything, it is § 10's "context" that seems to require the use of a definition that is different from that of § 2(10).

Third, the dual use of "prospectus" in § 2(10), which both defines "prospectus" broadly and uses it as a term of art, makes clear that the statute is using the word in at least two different senses, and paves the way for such variations in the ensuing provisions. To adopt the majority's argument would force us to eliminate § 2(10) in favor of some narrower, common-law definition of "prospectus." Our mandate to interpret statutes does not allow us to recast Congress' handiwork so completely.

The majority transforms § 10 into the tail that wags the 1933 Act dog. An analogy will illustrate the point. Suppose that the Act regulates cars, and that § 2(10) of the Act defines a "car" as any car, motorcycle, truck, or trailer. Section 10 of this hypothetical statute then declares that a car shall have seatbelts, and § 5 states that it is unlawful to sell cars without seatbelts. Section 12(2) of this Act then creates a cause of action for misrepresentations that occur during the sale of a car. It is reasonable to conclude that §§ 5 and 10 apply only to what we ordinarily refer to as "cars," because it would be absurd to require motorcycles and trailers to have seatbelts. But the majority's reasoning would lead to the further conclusion that § 12(2) does not cover sales of motorcycles, when it is clear that the Act includes such sales.

## C

Contrary to the majority's conclusion, it seems to me that the surrounding text of § 12(2) supports my reading. On its face, § 12(2) makes none of the usual distinctions between initial public offerings and aftermarket trading, or between

public trading and privately negotiated sales. The provision does not mention initial public offerings, as do other provisions of the Act. See, *e. g.,* § 4 of the 1933 Act, 15 U. S. C. § 77d(2) (exempting "transactions by an issuer not involving any public offering"). Nor did Congress limit § 12(2) to issuers, as it chose to do with other provisions that are limited to initial distributions. See § 11 of the 1933 Act, 15 U. S. C. § 77k(a)(2) (holding liable for a false registration statement "every person who was a director of . . . or partner in the issuer" at time of filing). Instead, § 12(2) refers more broadly to "any person who . . . offers or sells a security." [1] If, as the majority suggests, Congress had intended to limit § 12(2) to initial public offerings, it presumably would have used words such as "issuer," "public offering," or "private," or "resale," or at least discussed trading on the exchanges or the liability of dealers, underwriters, and issuers. But on this score, § 12(2) is notable for its silence.

I assume that when Congress chose to define liability under the securities laws, it used precise language that it was familiar with to make its meaning clear. Just last Term, in holding that § 10(b) of the 1934 Act did not create liability for aiders and abettors, we said: "If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not." *Central Bank of Denver,* 511 U. S., at 177. This rule of construction can cut both ways. If in *Central Bank of Denver* Congress' failure to use "aid" or "abet" limited liability under the securities laws, then here the absence of "public offering," "issuers," or some similar limitation surely suggests that Congress sought to extend § 12(2) to private and secondary transactions.

---

[1] "Sell" is defined broadly to include "every contract of sale or disposition of a security or interest in a security, for value," while "offer" refers to "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U. S. C. § 77b(3).

The dearth of limiting language in § 12(2) is all the more striking in light of the 1933 Act's detailed exemption provisions. Section 4 of the 1933 Act, appropriately entitled "Exempted Transactions," specifically excludes from § 5's registration requirements both "transactions by any person other than an issuer, underwriter, or dealer" and "transactions by an issuer not involving any public offering." 15 U. S. C. §§ 77d(1) and (2). If Congress had intended § 12(2) to govern only initial public offerings, it would have been simple for Congress to have referred to the § 4 exemptions in § 12(2). As we have noted, "although § 4(2) of the 1933 Act . . . exempts transactions not involving any public offering from the Act's registration provisions, there is no comparable exemption from the antifraud provisions." *Landreth Timber Co.*, 471 U. S., at 692. Section 12(2)'s explicit exception only for government securities shows that Congress knew how to exempt certain securities and transactions when it wanted to.

The majority argues that § 4's exemption suggests a contrary conclusion. *Ante*, at 573. According to the majority, if Congress had intended § 12(2) to apply to private, secondary transactions, it would have said so explicitly. This reasoning goes too far, for it would render § 4 superfluous. After all, if the majority applied its approach to § 5 (which prohibits the sale of a security without first registering the security or without first sending a prospectus), then it would conclude—even in the absence of § 4—that § 5 refers only to initial offerings. But this would have precluded any need to include § 4 at all.

The majority claims that under my reading, "there is no ready explanation for exempting" government securities from § 12(2). *Ante*, at 571. But Congress could have concluded that it was unnecessary to impose liability on the private or secondary sellers of a government security because information concerning government securities is already available either from the markets or from government enti-

ties. Or Congress could have chosen not to burden government securities with the costs that might accrue from additional liabilities on initial or secondary sales.

## II

The majority argues that the 1933 Act's central focus on initial public offerings requires us to read its provisions as extending only to those distributions. We have recognized, however, that not all of the provisions of the 1933 Act are limited to initial public offerings, nor are all of the provisions of the 1934 Act limited to secondary transactions. Thus, § 10(b) of the 1934 Act and Securities and Exchange Commission (SEC) Rule 10b–5 reach both initial and secondary distributions. Similarly, we have held that § 17 of the 1933 Act reaches beyond initial distributions to aftermarket trading. *United States* v. *Naftalin,* 441 U. S. 768 (1979).

In reaching our holding in *Naftalin,* we rejected two arguments relevant here. First, we were not swayed by the contention that the structure of the 1933 Act limited § 17 to new issues. As we noted, the statutory language "makes no distinctions between the two kinds of transactions [initial distributions and ordinary market trading]." *Id.,* at 778. Second, the 1934 Act's prohibition of fraud in the secondary sale of securities did not lead us to infer that the 1933 Act's provisions apply solely to new offerings. " 'The fact that there may well be some overlap is neither unusual nor unfortunate.' " *Ibid.* (quoting *SEC* v. *National Securities, Inc.,* 393 U. S. 453, 468 (1969)).

Here, § 12(2) contains no distinction between initial and secondary transactions, or public and private sales. Thus, if the majority wished to remain faithful to *Naftalin,* it would hold that the provision reaches both secondary and private transactions. To be sure, § 10(b) of the 1934 Act, 15 U. S. C. § 78j(b), and SEC Rule 10b–5 provide a cause of action for misstatements made in connection with secondary and private securities transactions. However, "it is hardly a novel

proposition that the [1933 and 1934 Acts] 'prohibit some of the same conduct.'" *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 383 (1983). *Naftalin* counsels the Court to reject arguments that we should read § 12(2) narrowly in order to avoid redundancy in securities regulation. 441 U. S., at 778.

In fact, it is quite possible that the Congress of 1933–1934 originally intended no overlap between § 12(2) and the 1934 Act, but instead expected § 12(2) to serve as the *only* cause of action for the private or secondary sale of securities. As we have noted before, neither the text of § 10(b) nor that of SEC Rule 10b–5 provides for private claims, and "we have made no pretense that it was Congress' design to provide the remedy afforded." *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350, 359 (1991). Only § 12(2) explicitly provided a broad remedy for private or aftermarket sales. It seems unlikely that Congress would have failed to provide *any* cause of action for investors based on misstatements in market transactions. 9 L. Loss & J. Seligman, Securities Regulation 4220 (3d ed. 1992).

Instead of reading *Naftalin* properly, the majority attempts to narrow the case to its facts. According to the majority, *Naftalin* requires that no provision of the 1933 Act should be interpreted to extend liability to secondary transactions unless either the statutory language or the legislative history clearly indicate that Congress intends to do so. If anything, *Naftalin* implements the opposite rule: that a provision of the 1933 Act extends to both initial offerings and secondary trading unless the text makes a "distinctio[n] between the two kinds of transactions." 441 U. S., at 778. In any event, the statutory language seems clear enough to me.[2]

---

[2] The majority responds that the legislative history must also clearly indicate that Congress intended to expand liability. *Naftalin* itself imposed no such requirement. Moreover, the legislative history relied upon by the majority and by the Court in *Naftalin* does not support the conclu-

## III

The majority's analysis of § 12(2) is motivated by its policy preferences. Underlying its reasoning is the assumption that Congress could never have intended to impose liability on sellers engaged in secondary transactions. Adopting a chiding tone, the majority states that "[w]e are reluctant to conclude that § 12(2) creates vast additional liabilities that are quite independent of the new substantive obligations that the Act imposes." *Ante*, at 572. Yet, this is exactly what Congress did in § 17(a) of the 1933 Act as well as in § 10(b) of the 1934 Act. Later, the majority says: "It is not plausible to infer that Congress created this extensive liability for every casual communication between buyer and seller in the secondary market." *Ante*, at 578. It is not the usual practice of this Court to require Congress to explain why it has chosen to pursue a certain policy. Our job simply is to apply the policy, not to question it.

I share the majority's concern that extending § 12(2) to secondary and private transactions might result in an unwanted increase in securities litigation. But it is for Congress, and not for this Court, to determine the desired level of securities liability. As we said last Term in *Central Bank of Denver*, policy considerations " 'cannot override our interpretation of the text and structure of the Act, except to the extent that they may help to show that adherence to the text and structure would lead to a result 'so bizarre' that Con-

---

sion that Congress wanted to extend § 17(a) to secondary sales. The passage cited by the majority and by *Naftalin*, S. Rep. No. 47, 73d Cong., 1st Sess., 4 (1933), see *ante*, at 577–578, was unrelated to § 17(a), and instead discussed a Senate proposal which was replaced by the House bill as the basis for the 1933 Act. In fact, the §§ 11 and 12 referred to in the Senate Report were originally extensive exemption, rather than liability, provisions that did not survive the legislative process. See S. 875, 73d Cong., 1st Sess., 20–24 (1933). The majority's approach seriously undermines this Court's holding and methodology in *Naftalin*.

gress could not have intended it.'" 511 U. S., at 188 (quoting *Demarest* v. *Manspeaker*, 498 U. S. 184, 191 (1991)). The majority is concerned that a contrary reading would have a drastic impact on the thousands of private and secondary transactions by imposing new liabilities and new transaction costs. But the majority forgets that we are only enforcing *Congress'* decision to impose such standards of conduct and remedies upon sellers. If the majority believes that § 12(2)'s requirements are too burdensome for the securities markets, it must rely upon the other branches of Government to limit the 1933 Act.

Unfortunately, the majority's decision to pursue its policy preferences comes at the price of disrupting the process of statutory interpretation. The majority's method turns on its head the commonsense approach to interpreting legal documents. The majority begins by importing a definition of "prospectus" from beyond the four corners of the 1933 Act that fits the precise use of the term in § 10. Initially ignoring the definition of "prospectus" provided at the beginning of the statute by Congress, the majority finally discusses § 2(10) to show that it does not utterly preclude its preferred meaning. Only then does the majority decide to parse the language of the provision at issue. However, when one interprets a contract provision, one usually begins by reading the provision, and then ascertaining the meaning of any important or ambiguous phrases by consulting any definitional clauses in the contract. Only if those inquiries prove unhelpful does a court turn to extrinsic definitions or to structure. I doubt that the majority would read in so narrow and peculiar a fashion most other statutes, particularly one intended to restrict causes of action in securities cases.

The majority's methodology also has the effect of frustrating Congress' will. In the majority's view, there seems to be little reason for Congress to have defined "prospec-

tus," or to have included a §2 definition at all. If all the key words of the 1933 Act are to be defined by the meanings imparted to them by the securities industry, there should be no need for Congress to attempt to define them by statute. The majority does not permit Congress to implement its intent unless it does so exactly as the Court wants it to.

For the foregoing reasons, I respectfully dissent.

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, dissenting.

A seller's misrepresentation made "by means of a prospectus or oral communication" is actionable under § 12(2) of the Securities Act of 1933, 15 U. S. C. § 77*l*(2). To limit the scope of this civil liability provision, the Court maintains that a communication qualifies as a prospectus only if made during a public offering.[1] Communications during either secondary trading or a private placement are not "prospectuses," the Court declares, and thus are not covered by § 12(2).

As JUSTICE THOMAS persuasively demonstrates, the statute's language does not support the Court's reading. Section 12(2) contains no terms expressly confining the provision to public offerings, and the statutory definition of "prospectus"—"any prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security," § 2(10), 15 U. S. C. § 77b(10)—is capacious.

The Court presents impressive policy reasons for its construction, but drafting history and the longstanding scholarly and judicial understanding of § 12(2) caution against judicial resistance to the statute's defining text. I would leave any alteration to Congress.

---

[1] I understand the Court's definition of a public offering to encompass both transactions that must be registered under § 5, 15 U. S. C. § 77e, and transactions that would have been registered had the securities involved not qualified for exemption under § 3, 15 U. S. C. § 77c.

## I

To construe a legislatively defined term, courts usually start with the defining section. Section 2(10) defines prospectus capaciously as "any prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security," 15 U. S. C. § 77b(10). The items listed in the defining provision, notably "letters" and "communications," are common in private and secondary sales, as well as in public offerings. The § 2(10) definition thus does not confine the § 12(2) term "prospectus" to public offerings.

The Court bypasses § 2(10), and the solid support it gives the Court of Appeals' disposition. Instead of beginning at the beginning, by first attending to the definition section, the Court starts with § 10, 15 U. S. C. § 77j, a substantive provision. See *ante*, at 568–569. The Court correctly observes that the term "prospectus" has a circumscribed meaning in that context. A prospectus within the contemplation of § 10 is a formal document, typically a document composing part of a registration statement; a § 10 prospectus, all agree, appears only in public offerings. The Court then proceeds backward; it reads into the literally and logically prior definition section, § 2(10), the meaning "prospectus" has in § 10.

To justify its backward reading—proceeding from § 10 to § 2(10) and not the other way round—the Court states that it "cannot accept the conclusion that [the operative word 'prospectus'] means one thing in one section of the Act and something quite different in another." See *ante*, at 573. Our decisions, however, constantly recognize that "a characterization fitting in certain contexts may be unsuitable in others." *NationsBank of N. C., N. A.* v. *Variable Annuity Life Ins. Co., ante,* at 262. In *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U. S. 427 (1932), we held that the word "trade" has a more encompassing meaning in

§ 3 than in § 1 of the Sherman Act, see *id.*, at 433–435, and explained:

> "Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning. . . . But the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent. . . .
>
> "It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the legislature intended it should have in each instance." *Id.*, at 433.

See also Cook, "Substance" and "Procedure" in the Conflict of Laws, 42 Yale L. J. 333, 337 (1933) ("The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against.").

According "prospectus" discrete meanings in § 10 and § 12(2) is consistent with Congress' specific instruction in § 2 that definitions apply "unless the context otherwise requires," 15 U. S. C. § 77b. As the Court of Appeals construed the Act, § 2(10)'s definition of "prospectus" governs § 12(2), which accommodates without strain the definition's broad reach; by contrast, the specific context of § 10 requires a correspondingly specific reading of "prospectus."

Indeed, in the Investment Company Act of 1940, Congress explicitly recognized that the Securities Act uses "prospectus" in two different senses—one in § 10, and another in the rest of the Act:

" 'Prospectus,' as used in [§ 22 of the Investment Company Act], means a written prospectus intended to meet the requirements of section 10(a) of the Securities Act of 1933 . . . and currently in use. As used elsewhere, 'prospectus' means a prospectus as defined in the Securities Act of 1933." § 2(31), 54 Stat. 794, as amended, 15 U. S. C. § 80a–2(31).[2]

## II

Most provisions of the Securities Act govern only public offerings, and the legislative history pertaining to the Act as a whole shares this orientation. See *ante*, at 580 (citing H. R. Rep. No. 85, 73d Cong., 1st Sess., 5 (1933)). Section 17(a) of the Act, 15 U. S. C. § 77q(a), however, is not limited to public offerings; that enforcement provision, this Court has recognized, also covers secondary trading. See *United States* v. *Naftalin*, 441 U. S. 768 (1979). The drafting history is at least consistent with the conclusion that § 12(2), like § 17(a), is not limited to public offerings.

The drafters of the Securities Act modeled this federal legislation on the British Companies Act, 19 & 20 Geo. 5, ch. 23 (1929). See Landis, The Legislative History of the Securities Act of 1933, 28 Geo. Wash. L. Rev. 29, 34 (1959) (Landis and the other drafters "determined to take as the base of [their] work the English Companies Act"); see also *SEC* v. *Ralston Purina Co.*, 346 U. S. 119, 123 (1953) (characterizing the Companies Act as a "statutory anteceden[t]" of federal securities laws). The Companies Act defined "prospectus" as "any prospectus, notice, circular, advertisement, or other invitation, *offering to the public* for subscription or purchase any shares or debentures of a company," 19 & 20 Geo. 5, ch. 23, § 380(1) (1929) (emphasis added). Though the drafters of the Securities Act borrowed the first four

---

[2] Although the Court finds our reading of § 2(10) redundant, see *ante*, at 574–575, the Court recognizes that Congress built redundancy into the definition by defining a "prospectus" as a "prospectus." See *ante*, at 575–576.

terms of this definition, they did not import from the British legislation the language limiting prospectuses to communications "offering [securities] to the public." This conspicuous omission suggests that the drafters intended the defined term "prospectus" to reach beyond communications used in public offerings.[3]

The House Conference Report, which explains the Act in its final form, describes § 12(2) in broad terms, and nowhere suggests that the provision is limited to public offerings:

> "The House bill (sec. 12) imposes civil liability for using the mails or the facilities of interstate commerce to sell securities (including securities exempt, under section 3, from other provisions of the bill) *by means of representations which are untrue or are misleading by reason of omissions of material facts."* H. R. Conf. Rep. No. 152, 73d Cong., 1st Sess., 26–27 (1933) (emphasis added).

Nor does the Report mention the word "prospectus," even though one would expect that word to figure prominently if it were the significant limitation the Court describes. See also Rapp, The Proper Role of Securities Act Section 12(2) as an Aftermarket Remedy for Disclosure Violations, 47 Bus. Law. 711, 719–724 (1992) (offering detailed analysis of legislative history).[4]

---

[3] Though the Court cites legislative history to show Congress' intent to follow, rather than depart from, the British statute, these sources suggest an intention to afford *at least as much* protection from fraud as the British statute provides. See *ante,* at 582–583 (quoting H. R. Rep. No. 85, 73d Cong., 1st Sess., 9 (1933)) ("What is deemed necessary for sound financing in conservative England ought not be unnecessary for the more feverish pace which American finance has developed."). Congress' provision for liability beyond "offering[s] to the public," however, suggests a legislative conclusion that the "feverish pace" of American finance called for greater protection from fraud than the British Act supplied.

[4] Though House Report No. 85 affords support for the reading advanced by the Court, it predates the Conference Report. Moreover, I do not share the Court's view that Report No. 85 speaks with clarity and specific-

Commentators writing shortly after passage of the Act understood § 12(2) to cover resales and private sales, as well as public offerings. Felix Frankfurter, organizer of the team that drafted the statute, firmly stated this view. See Frankfurter, The Federal Securities Act: II, 8 Fortune 53, 108 (1933) (Act "seeks to terminate the facilities of the mails and of interstate commerce for dishonest or unfair dealings in the sale of *all* private or foreign government securities, *new or old*") (emphasis added). William O. Douglas expressed the same understanding. See Douglas & Bates, The Federal Securities Act of 1933, 43 Yale L. J. 171, 183 (1933) (noting that, except for transactions involving securities exempt under § 3(a)(2), 15 U. S. C. § 77c(a)(2), no securities or transactions are exempt from § 12(2)).

Most subsequent commentators have agreed that § 12(2), like § 17(a), is not confined to public offerings. See, *e. g.*, H. Bloomenthal, Securities Law Handbook § 14.05, pp. 14–13, 14–38 (1991); 2 A. Bromberg & L. Lowenfels, Securities Fraud and Commodities Fraud § 5.2(600) (1993); 1 T. Hazen, Law of Securities Regulation § 7.5, p. 318 (2d ed. 1990); 17A J. Hicks, Civil Liabilities: Enforcement and Litigation under the 1933 Act § 6.01[3], pp. 6–12 to 6–39 (1994); 9 L. Loss & J. Seligman, Securities Regulation 4217–4222 (3d ed. 1992); Maynard, Section 12(2) of the Securities Act of 1933: A

---

ity to the question at hand—§ 12(2)'s scope. See *ante*, at 581. In suggesting that registration statements and prospectuses are "the basic information by which the public is solicited," and that the Act's liability provisions penalize the "originators of securities," see H. R. Rep. No. 85, 73d Cong., 1st Sess., 1, 9 (1933), the Report does not focus on § 12(2), but on "[s]ections 11 and 12" in general. *Ibid.* The Report's broad address thus takes in § 11, 15 U. S. C. § 77k, which is directed at misstatements in registration statements, and § 12(1), 15 U. S. C. § 77*l*(1), which targets sales and offers to sell securities in violation of the Act's registration provisions. There is no dispute that the latter two provisions apply only to public offerings— or, to be precise, to transactions subject to registration. The dominant point made by the Report, moreover, is that the civil liability sections are exacting.

Remedy for Fraudulent Postdistribution Trading?, 20 Sec. Reg. L. J. 152 (1992); Rapp, *supra,* at 711; Comment, Applying Section 12(2) of the 1933 Securities Act to the Aftermarket, 57 U. Chi. L. Rev. 955 (1990). But see Weiss, The Courts Have It Right: Securities Act Section 12(2) Applies Only to Public Offerings, 48 Bus. Law. 1 (1992).

While Courts of Appeals have divided on § 12(2)'s application to secondary transactions,[5] every Court of Appeals to consider the issue has ruled that private placements are subject to § 12(2). See *Metromedia Co.* v. *Fugazy,* 983 F. 2d 350, 360–361 (CA2 1992), cert. denied, 508 U. S. 952 (1993); *Haralson* v. *E. F. Hutton Group, Inc.,* 919 F. 2d 1014, 1032 (CA5 1990); *Nor-Tex Agencies, Inc.* v. *Jones,* 482 F. 2d 1093, 1099 (CA5 1973); *Pacific Dunlop Holdings Inc.* v. *Allen & Co. Inc.,* 993 F. 2d 578, 587 (CA7 1993) (exemptions in § 4, 15 U. S. C. § 77d, do not limit § 12(2)'s reach); see also *Adalman* v. *Baker, Watts & Co.,* 807 F. 2d 359 (CA4 1986) (applying § 12(2) to private sale). "[L]ongstanding acceptance by the courts [of a judicial interpretation], coupled with Congress' failure to reject" that interpretation, "argues significantly in favor of accept[ing]" it. *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 733 (1975).

The drafters of the Uniform Securities Act, in 1956, modeled § 410(a)(2) of that Act[6] on § 12(2) of the federal Securi-

---

[5] Compare *Pacific Dunlop Holdings Inc.* v. *Allen & Co. Inc.,* 993 F. 2d 578 (CA7 1993) (applying § 12(2) to secondary transactions), cert. granted, 510 U. S. 1083, cert. dism'd, 510 U. S. 1160 (1994), with *First Union Discount Brokerage Services, Inc.* v. *Milos,* 997 F. 2d 835, 842–844 (CA11 1993) (holding § 12(2) inapplicable to secondary transactions); *Ballay* v. *Legg Mason Wood Walker, Inc.,* 925 F. 2d 682 (CA3) (same), cert. denied, 502 U. S. 820 (1991).

[6] Section 410(a)(2) imposes liability on "[a]ny person who"

"(2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he

ties Act. Notably, the Uniform Act drafters did not read § 12(2) as limited to public offerings. Accordingly, they did not so limit § 410(a)(2). Bloomenthal, *supra*, § 14.05, at 14–38 to 14–39; see also § 410(a)(2) comment, 7B U. L. A. 644 (1985) (describing as comparable scope of § 410(a)(2) and scope of Uniform Securities Act § 101, the Uniform Act's analog to Securities Act § 17(a)).[7] Section 410, it is true, does not contain the "prospectus or oral communication" language, perhaps because "prospectus" is not a defined term in the Uniform Securities Act. See § 401, 7B U. L. A. 578–581 (1985) (listing definitions). There is scant doubt, however, that the drafters of Uniform Act § 410(a)(2) intended the provision to have the same meaning as Securities Act § 12(2). See § 410(a)(2) comment, 7B U. L. A. 644 ("This clause is almost identical with § 12(2) of the Securities Act of 1933 . . . ."); L. Loss, Commentary on the Uniform Securities Act 147 (1976) ("The resemblance [of § 410(a)(2) of the Uniform Act] to § 12(2) of the Securities Act of 1933, 15 U. S. C. § 77*l*(2), will once more make for an interchangeability of federal and state judicial preceden[ts] in this very important area.").

\* \* \*

In light of the text, drafting history, and longstanding scholarly and judicial understanding of § 12(2), I conclude that § 12(2) applies to a private resale of securities. If adjustment is in order, as the Court's opinion powerfully

---

did not know, and in the exercise of reasonable care could not have known, of the untruth or omission . . . ." 7B U. L. A. 643 (1985).

[7] State adaptations of § 410(a)(2) have been applied consistently beyond public offerings; they have been read to cover secondary transactions, see, e. g., *Banton* v. *Hackney*, 557 So. 2d 807 (Ala. 1989); *Bradley* v. *Hullander*, 272 S. C. 6, 249 S. E. 2d 486 (1978); *S & F Supply Co.* v. *Hunter*, 527 P. 2d 217 (Utah 1974), as well as private transactions, see, e. g., *Towery* v. *Lucas*, 128 Ore. App. 555, 876 P. 2d 814 (1994); *Jenkins* v. *Jacobs*, 748 P. 2d 1318 (Colo. App. 1987); *Gaudina* v. *Haberman*, 644 P. 2d 159 (Wyo. 1982); *Foelker* v. *Kwake*, 279 Ore. 379, 568 P. 2d 1369 (1977).

suggests it is,[8] Congress is equipped to undertake the alteration. Accordingly, I dissent from the Court's opinion and judgment.

---

[8] Section 12(2) did not become prominent in Securities Act litigation until this Court held in *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185 (1976), that an action for civil damages under § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. § 78j(b), and Securities and Exchange Commission Rule 10b–5, 17 CFR § 240.10b–5 (1975), requires proof of scienter. See Loss, The Assault on Securities Act Section 12(2), 105 Harv. L. Rev. 908, 910 (1992).

Though the Court of Appeals' reading of § 12(2) shows fidelity to the statute Congress passed, this Court's opinion makes noteworthy practical and policy points. As the Court observes, *ante*, at 578, under the Court of Appeals' reading, § 12(2) would equip buyers with a rescission remedy for a negligent misstatement or omission even if the slip did not cause the buyer's disenchantment with the investment. And, in light of the "free writing" provision of § 2(10)(a), 15 U. S. C. § 77b(10)(a) (a communication will not be deemed a "prospectus" if its recipient was previously sent a prospectus meeting the requirements of § 10), the Court of Appeals' reading, ironically, would leave a seller more vulnerable in private transactions than in public ones.