Camelot Event Driven Fund v Morgan Stanley & Co. LLC (2024 NY Slip Op 50005(U))

[*1]

Camelot Event Driven Fund v Morgan Stanley & Co. LLC

2024 NY Slip Op 50005(U)

Decided on January 4, 2024

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 4, 2024
Supreme Court, New York County

Camelot Event Driven Fund, a Series of Frank Funds Trust, Plaintiff,

against
Morgan Stanley & Co. LLC, J.P. Morgan Securities, LLC, Citigroup Global Markets Inc., Goldman Sachs & Co. LLC, Mizuho Securities USA LLC, Siebert Williams Shank & Co., LLC, BNP Paribas Securities Corp., RBC Capital Markets, LLC, U.S. Bancorp Investments, Inc., SMBC Nikko Securities America, Inc., TD Securities (USA) LLC, SG Americas Securities, LLC, MUFG Securities Americas Inc., CastleOak Securities, L.P., Samuel A. Ramirez & Company, Inc., Academy Securities, Inc., R. Seelaus & Co. LLC, Wells Fargo Securities, LLC, BNY Mellon Capital Markets, LLC, Intesa Sanpaolo S.P.A., ICBC Standard Bank PLC, ViacomCBS, Inc., Robert M. Bakish, Katherine Gill-Charest, Shari E. Redstone, Candace K. Beinecke, Barbara M. Byrne, Linda M. Griego, Robert N. Klieger, Judith A. Mchale, Ronald L. Nelson, Charles E. Phillips Jr, Susan Schuman, Nicole Seligman, Frederick O. Terrell, Defendant.

Index No. 654959/2021

Plaintiffs by:
Glancy Prongay & Murray LLP, 745 Fifth Avenue Fifth Floor, New York, NY 10151
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, 1251 Avenue Of The Americas 44th Floor, New York, NY 10020
SLARSKEY LLC, 767 3rd Ave Fl 14, New York, NY 10017

Defendants by:
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, One Manhattan West, New York, NY 10001
SIMPSON THACHER & BARTLETT LLP, 425 Lexington Avenue, New York, NY 10017
CADWALADER, WICKERSHAM & TAFT LLP, 200 Liberty St, New York, NY 10281
LATHAM & WATKINS LLP, 1271 Avenue Of The Americas, New York, NY 10020
WILLKIE FARR & GALLAGHER LLP, 787 7th Ave, New York, NY 10019 
SIDLEY AUSTIN LLP, 787 7th Ave, New York, NY 10019
Shearman & Sterling LLP, 599 Lexington Avenue, New York, NY 10022

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 013) 258, 259, 260, 261, 262, 263, 264, 265, 266, 267, 268, 269, 321, 323, 328, 331, 332, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343, 344, 345, 346, 347, 348, 349, 350, 351, 352, 353, 354, 355, 356 were read on this motion to/for MISCELLANEOUS.
The Plaintiffs motion (Mtn. Seq. No. 13) for class certification is granted.
Reference is made to a Decision and Order of this Court (the Prior Decision; NYSCEF Doc. No. 174), dated February 6, 2023. The facts are discussed extensively in the Prior Decision. Familiarity is presumed. Terms used but not otherwise defined shall have the meaning ascribed thereto in the Prior Decision.
The Facts Relevant to Class Certification
Briefly, according to the well pled amended complaint (the AC; NYSCEF Doc. No. 74), this lawsuit alleges violations of Section 11 and 12(a) of the 1933 Act against the Underwriter Defendants based on undisclosed conflicts of interest and the dissemination of the massive failed stock speculation of Sung Kook Hwang and his family run office, Archegos, on the uninformed and unsuspecting plaintiff investors who purchased common and preferred stock in the approximately $2.65 billion Secondary Public Offerings (the SPOs) of Viacom. 
As discussed in the Prior Decision, it is alleged that the Offering Documents were materially misleading in violation of the 1933 Act because they failed to disclose the Conflicted Defendants' conflict of interest and their planned $20 billion dump of Viacom stock (10x the amount of the SPOs or approximately 34% of the equity in Viacom) on the market during the SPOs (NYSCEF Doc. No. 174, at 5-6). This omission was material and rendered the Offering Documents defective because these massive block sales would necessarily rupture the market for the SPOs (id., at 56-57). The Offering Documents are also alleged to have been materially misleading because they also contained certain affirmative misstatements including, among other things, that the Conflicted Defendants could engage in market stabilizing transactions. This is alleged to have been materially misleading because, far from engaging in market stabilizing transactions, the Conflicted Defendants planned to engage in transactions relating to massive swap positions they held to minimize their own losses, but which necessarily would destabilize the market for the SPOs (id., at 8).[FN1]

In other words, as set forth in the well pled AC and discussed in the Prior Decision, the Plaintiffs who purchased 
both common and preferred stock in the SPOs had understood from the Offering Documents that the Underwriter Defendants (which included the Conflicted Defendants) might engage in stabilizing transactions to support the value of the SPOs. Nothing in the Offering Documents revealed that the Conflicted Defendants would destabilize the market for the stock and put their own financial interests in avoiding losses ahead of the interests of the unsuspecting investorsby effectively undermining the market capitalization of Viacom (id., at 57). 
As discussed in the Prior Decision, each Underwriter Defendant had an obligation to conduct independent due diligence as to all material risks that affected the SPOs, including [*2]inquiring whether any of the Underwriter Defendants had material non-public information that would affect the SPOs, like precisely the information that gave rise to the conflicts of interest created by the massive swap positions and the anticipated massive dumping of Viacom stock held by the Conflicted Defendants (NYSCEF Doc. No. 174, at 64-65; see In re WorldCom, Inc. Sec. Litig., 346 FSupp2d 628 [SD NY 2004]). As recognized by the In re WorldCom court (Cote, J.), in performing due diligence, each Underwriter Defendant could not simply rely on the lead underwriter to perform adequate due diligence nor on the Conflicted Defendants to volunteer information about their conflicts of interest.
Thus, the Plaintiffs are suing (i) the Conflicted Defendants for failing to disclose material non-public information known to them and (ii) the other Underwriter Defendants for failing to perform the required due diligence on the SPOs (and for failing to make appropriate disclosures) and for certain affirmative misstatements, all of which allegedly necessarily rendered the Offering Documents materially misleading in violation of Sections 11 and 12(a) of the 1933 Act.
The SPOs became effective on March 22, 2021 and closed on March 26, 2021. The Plaintiffs allege that the Underwriter Defendants planned prior to and during the SPOs to sell their Viacom stock (and failed to disclose that in the Offering Documents), and then, when they learned that Archegos could not meet its margin call, actually sold $20 billion in Viacom stock between March 22, 2021 and March 29, 2021.
The Plaintiffs now seek to certify the following as the putative class:
All persons and entities who purchased or otherwise acquired (i) ViacomCBS Inc. Class B Common Stock issued in Viacom's secondary public offering, which was announced on March 22, 2021, priced on March 23, 2021, and closed on March 26, 2021; and/or (ii) Viacom's 5.75% Series A Mandatory Convertible Preferred Stock issued in or traceable to Viacom's initial public offering of that Preferred Stock, which was announced on March 22, 2021, priced on March 23, 2021, and closed on March 26, 2021, and were damaged thereby.
As proposed, the Plaintiffs would exclude from the proposed class (i) Defendants, the officers, directors, and affiliates of Defendants at all relevant times, members of their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest; (ii) Viacom, now known as Paramount Global, its officers, directors, and affiliates at all relevant times, and members of their immediate families, their legal representatives, heirs, successors or assigns; and (iii) Archegos and the officers, directors, and affiliates of Archegos at all relevant times, including Mr. Hwang, members of their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which Mr. Hwang has or had a controlling interest.
In their opposition papers, the Defendants argue that (i) named Plaintiff Camelot Event Driven Fund (Camelot) is an atypical and inadequate class representative and (ii) the proposed class is overbroad and should be narrowed to exclude (1) any purchasers who purchased common stock shares outside of the SPOs, (2) any purchasers who purchased preferred stock after March 26, and (3) any purchasers who did not purchase stock in either offering and thus lacks standing under Section 12(a)(2) of the 1933 Act. 
The Court notes that the Underwriter Defendants do not oppose class certification based on CPLR 901 (a)(1), (2) or (5)'s numerosity, commonality or superiority requirements or CPLR 902's other considerations. Nonetheless, for completeness, as set forth below, these requirements are well satisfied.

 Discussion
CPLR 901(a) provides that:
One or more members of a class may sue or be sued as representative parties on behalf of all if:
1. the class is so numerous that joinder of all members is impracticable, whether otherwise required or permitted is impracticable;
2. (there are common questions of law or fact common to the class which predominate over any questions affecting only individual members;
3. the claims or defenses of the representative parties are typical of the claims or defenses of the class;
4. the representative parties will fairly and adequately protect the interest of the class; and
5. a class action is the superior method to other available methods for the fair and efficient adjudication of the controversy. Although the party seeking class certification bears the burden of establishing these criteria, the determination rests in the sound discretion of the trial court and, in exercising that discretion, the court is to liberally construe the statute (Kudinov v Kel-Tech Const. Inc., 65 AD3d 481, 481 [1st Dept 2009]). If the factors of CPLR 901 are met, the court should consider the additional factors set forth in CPLR 902, including (i) the interest of the members of the class in individually controlling the prosecution or defense of separate actions, (ii) the impracticability or inefficiency of prosecuting or defending separate actions, (iii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (iv) the desirability or undesirability of concentrating litigation of the claim in the particular forum, and (v) the difficulties likely to be encountered in the management of a class action. 
1. The CPLR 901(a)(1) Numerosity Requirement is satisfied
The Underwriter Defendants do not challenge numerosity. A proposed class meets the numerosity requirement if joinder of all of the class members is impracticable. Although the Plaintiffs need not prove the precise class size, it is well settled that numerosity is presumed satisfied with a proposed class of forty or more plaintiffs (In re Bank of Am. Corp. Sec., Derivative, and Employee Retirement Income Sec. Act (ERISA) Litig., 281 FRD 134, 138 [SD NY 2012]). Under the circumstances of this alleged 1933 Act violation, CPLR 901(a)(1) is well satisfied.
2. The CPLR 901(a)(2) Commonality Requirement is satisfied
The Underwriter Defendants do not challenge commonality. The commonality requirement is satisfied where there are common questions of law or fact which would predominate any individual questions of law or fact. In this case, there are common questions which predominate any other issues, including the defense that the Defendant Underwriter's intend to assert against Camelot. These common questions include, among other things, whether the Offering Documents omitted or affirmatively misstated facts about the conflicts that the Conflicted Defendants had and whether the due diligence performed by the Underwriter Defendants as to all material information that could affect the SPOs (including unknown and undisclosed conflicts and planned block sales during the SPOs) was in fact performed and whether it was adequate. As such, the CPLR 901(a)(2) commonality requirement is satisfied.
3. The CPLR 901(a)(3) Typicality Requirement is satisfied
Typicality is met where the plaintiffs' claims derive from the same practice or course of conduct and are based upon the same legal theory (Pludeman v Northern Leasing Sys., Inc., 74 [*3]AD3d 420, 423 [1st Dept 2010]). Here, the Plaintiffs' claims arise from purchasing common stock and preferred stock in the SPOs based on allegedly untrue and materially misleading statements and omissions in the Offering Documents upon which they were entitled to rely. Camelot purchased 
both common and preferred stock in the SPOs during the specified class dates. Camelot's claims are therefore typical of 
all class members. 
The Underwriter Defendants, however, argue that they have what they perceive at this stage (before merits discovery) to be a different loss causation based defense against Camelot than they have against other members of the putative class, such that Camelot is atypical and not an appropriate class representative for class certification purposes. This argument fails.
The Appellate Division has held (i) that loss causation is generally not an element of a Section 11 claim and the heavy burden of maintaining negative loss causation as an affirmative defense falls on the defendants and (ii) that whether a trader is an "in and out" trader (i.e., a trader who buys and sells securities before or after any disclosure), and thus suffered damages from something other than the Underwriter Defendants' alleged misrepresentations and omissions, is by nature a highly fact specific showing that is quite premature on a motion for class certification (Kohl v Loma Negra Compania Indus. Argentina S.A., 210 AD3d 533, 533-535 [1st Dept 2022]). Thus, CPLR 901(a)(3) is satisfied and Camelot is an appropriate class representative.
4. The CPLR 901(a)(4) Adequacy Requirement is satisfied
The three factors to consider in determining whether the adequacy requirement is met are (i) potential conflicts of interest between the representative and the class members, (ii) personal characteristics of the proposed class representative, including familiarity with the lawsuit and financial resources, and (iii) the quality of the class counsel (Cooper v Sleepy's, LLC, 120 AD3d 742, 743-744 [2d Dept 2014]).
On the record before the Court, CPLR 901(a)(4) is satisfied. First, there are no conflicts of interest between Camelot and any absent class members. Second, the record demonstrates that Camelot is sufficiently familiar with the lawsuit. This was demonstrated by the testimony of Thomas Kirchner, a managing member of Camelot, who showed an understanding about what the action is about, including that it involves two offerings (tr at 43:18-44:13; 96:23-97:5; 104:20-106:23) (NYSCEF Doc. No. 339); Archegos (id., at 90:20-91:16; 92:17-93:5); the case's status, including the name of the judge (id., at 113:23-115:9); motions having been decided and discovery being ongoing (id., at 106:24-108:18); Camelot's ongoing monitoring of the case (id., at 109:6-110:20; 112:9-22); its co-plaintiff MPERS (id., at 115:15-21); and its fiduciary responsibilities as a class representative (id., at 97:8-98:12; 131:5-132:11), and who also showed that Camelot has adequate resources to prosecute this lawsuit. Third, Glancy Prongay & Murrary LLP and Bernstein Litowitz Berger & Grossman LLP are well qualified firms with extensive experience litigating complex securities class actions. As such, Camelot is an appropriate class representative and CPLR 901(a)(4) is satisfied.
5. The CPLR 901(a)(5) Superiority Requirement is satisfied
As discussed above, the Underwriter Defendants do not contest superiority. Under the circumstances discussed above, this putative class action is superior to other available methods for the fair and efficient adjudication of the controversy because it overcomes the problem that small recoveries may not provide sufficient incentive for an individual to bring a solo action against these well-heeled major financial institution Underwriter Defendants (Jenack v Goshen Operations, LLC, 2023 WL 7172539, * 4 [2d Dept 2023]) and avoids multiple lawsuits and the [*4]risk of inconsistent verdicts (New York City Coalition to End Lead Poisoning v Giuliani, 245 AD2d 49, 52 [1st Dept 1997]).
6. CPLR 902 Also Bodes in Favor of Class Certification
As indicated above, the Underwriter Defendants do not contest that a class action is appropriate. It is well understood that putative class actions are common methods of prosecuting alleged violations of the 1933 Act. Class actions pose little to no prejudice to potential putative class member because potential class members may opt-out and pursue their claims separately should they so choose. However, given the hundreds and potentially thousands of potential class members (and the lack of prejudice caused by asserting these claims in a putative class action), the impracticability and inefficiency of prosecuting separate actions weighs heavily in favor of class certification. The Plaintiffs indicate that that are no other actions alleging 1933 Act violations relating to the Viacom SPOs that would weigh against certifying the class. Lastly, litigating these claims in New York where Viacom's common and preferred stock trade on the NASDAQ and in the Commercial Division in New York County where these claims are routinely handled also bodes in favor of class certification in New York.
7. The Scope of the Class Should Not Be Limited At this Stage
The Underwriter Defendants also argue that the proposed class is overbroad and should be limited at this stage to exclude (i) purchasers who purchased their securities outside of the SPOs, (ii) purchasers of preferred stock who purchased their shares after March 26, 2021, and (iii) aftermarket or secondary market purchasers. The Court will address each in turn.
A. Common Stock Shares Purchased "Outside" the SPOs
Relying on Slack Techs., LLC v Pirani, 598 US 759 (2023), In re Century Aluminum Co. Sec. Litig, 729 F3d 1104 (9th Cir 2013), and In re Bank of America Corp. Sec., Derivative, and Employee Retirement Income Sec. Act (ERISA) Litig., 281 FRD 134 (SD NY 2012), the Underwriter Defendants argue that any order granting class certification should exclude "aftermarket" transactions by limiting the class to a "discrete group of investors who purchased directly from an underwriter shares allocated for and issued in the common stock offering." More specifically, the Underwriter Defendants argue that there were 567 million shares of outstanding Viacom stock at the time of the SPO and that the 20 million shares in the SPO represented only approximately 3.5% of the total outstanding Viacom common stock such that anyone who purchased stock on the open market on March 24, 2021 or later should be excluded because it would be impossible to trace the shares of "aftermarket" purchasers back to the allegedly offending Offering Documents. This argument fails because it is premature.
Simply put, tracing is a merits argument that is not a bar to defining the class at this stage of the litigation and the federal courts have made clear that a class certification motion can not "become a pretext for a partial trial on the merits" (In re Smart Technologies, Inc. Shareholder Litig., 295 FRD 50, 54 [SD NY 2013], quoting Teamsters Local 445 Freight Div. Pension Fund v Bombardier Inc., 546 F3d 196, 204 [2d Cir 2008] [quotation marks omitted]; see also In re IPO Sec. Litig., 471 F3d 24, 41 [2d Cir 2006] ["[A] district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement"]). As the United Stated District Court for the Southern District of New York (Torres, J.) recently succinctly explained, although standing to bring a Section 11 claim is limited to those that can trace their shares to the allegedly materially misleading offering documents, "tracing is a merits issue that the court need not consider at the class certification stage" (Set Capital LLC v Credit Suisse Group AG, 2023 WL 2535175 at *10 [SD NY 2023], citing Wallace v IntraLinks, 302 FRD 310, 319 [SD NY 2014]; see also In re [*5]IPO, 471 F3d at 41). 
Slack and In re Century, relied upon by the Underwriter Defendants, are thus inapposite. They are standing cases, not cases about class certification. In re Bank of America also does not compel the conclusion urged by the Underwriter Defendants because, in that case, the plaintiffs themselves sought to certify a class which was limited to purchasers of Bank of America stock issued under the offering documents (and did not seek to include a broader group of purchasers in the class who purchased stock "by means of a prospectus or oral communication" containing material misstatements or omissions) in the "aftermarket" or "secondary market." Accordingly, Judge Castel noted that there was no tracing issue raised and that there did not appear to be the need for the types of individualized inquiries that could defeat the predominance requirement of Rule 23(b)(3). 
Given its procedural posture, In re Bank of America does not however stand for the broader general proposition that this Court should limit the class at this stage of the litigation to exclude purchasers who purchased their securities "by means of a prospectus or oral communication" containing material misstatements and omissions in the "aftermarket" or "secondary market" and thus have standing to assert Section 12(a) based claims. As discussed below, for example, under the circumstances of this case, the stock held by the Conflicted Defendants (pursuant to swap agreements) which they are alleged to have sold during the SPOs may well have been sold by "means of a prospectus or oral communication" containing material misstatements or omissions. As such, excluding these purchasers from the class would be inappropriate. For completeness and clarity, the Court notes, however, that it will be incumbent upon the Plaintiffs as the case proceeds to demonstrate a class-wide tracing methodology for the Court to review to ensure that only those who can trace their purchases to the allegedly materially misleading Offering Documents or who otherwise purchased their stock "by means of a prospectus or oral communication" containing material misstatements or omissions are included in the class and have standing to assert the Sections 11 and 12(a)(2) claims at issue in this case. Based on the Court's review of that proposed methodology, as in the federal courts, the Court then can narrow or modify the class at a later stage in this litigation, if appropriate.
B. Preferred Stock Purchased After March 26, 2021
Relying on In re SunEdison, Inc. Sec. Litig., 329 FRD 124 (SD NY 2019), In re Initial Public Offerings Sec. Litig., 471 F3d 24 (2d Cir 2006), New Jersey Carpenters Health Fund v Residential Capital, LLC, 272 FRD 160 (SD NY 2011), Shockley v Adams Golf, Inc., 2005 WL 3654346 (D Del 2005), and Vignola v Fat Brands, Inc., 2020 WL 1934976 (Cent D Cal 2020), the Underwriter Defendants argue that the class relating to preferred stock should exclude those who purchased their shares after March 26, 2021 because by then "the truth" of what the Conflicted Defendants had done had been revealed to the public. This argument also fails.
The critical question at this stage is whether identical or substantially similar representations were made to the Plaintiffs and whether there are common questions of law or fact as to their veracity. Plaintiffs have shown that there are. Equally importantly, the Underwriter Defendants' argument presupposes the Court's acceptance of the Underwriter Defendants' merits based defense that whatever the various news articles revealed on March 26th, the publicly available information then disclosed all the material facts which had previously been omitted and corrected all of the materially misstated or omitted information, thereby remedying the allegedly defective Offering Documents. This is a fact-based merits argument that may or may not even be true, and in any event, may or may not ultimately succeed. It is, therefore, [*6]simply inappropriate at the class certification stage.
Moreover, critically distinguishing the cases cited by the Underwriter Defendants, is that in those cases the plaintiff's own allegations established the date of revelation as to omitted and misstated information. That is not the case here. In this case, the Plaintiffs' allegations do not establish March 26, 2021 as the date when the market finally had full corrective disclosure.
Indeed, the record before the Court does not establish that full corrective disclosure was in fact made, as the Underwriter Defendants assert but cannot at this time establish as a matter of law or by virtue of the Plaintiffs' own pleadings. To the contrary, the record before the Court only appears to indicate that certain news reporting (which were updating as of March 30, 2021; NYSCEF Doc. Nos. 341-343) appears to have indicated that large sales of the portfolio of stocks held by certain of the Conflicted Defendants (which included Viacom) were occurring and that Archegos had missed its margin call. But those news reports do not appear to have fully revealed the extent of the Conflicted Defendants' conflicts or that ten times the value of the SPOs of Viacom's stock were being dumped into the marketplace by the very people marketing and underwriting the SPOs (while making underwriting fees), or the extent of the diligence performed (or not) of the Underwriter Defendants (who are not Conflicted Defendants) on the SPOs. In fact, following this disaster, the Underwriter Defendants retained Paul Weiss to do a written report (highly unusual) to investigate what had in fact occurred. This too suggests that it is not settled as a matter of law that as of March 26, 2021 full and complete corrective revelation had occurred. Thus, at this stage of the proceedings, the date of revelation and the extent and effect of any information placed into the "total mix of information" available to the investing community are highly contested issues, critically distinguishing this case from the cases upon which the Underwriter Defendants rely.
C. Section 12(a)(2) Claims for Aftermarket or Secondary Market Purchasers
Relying primarily on Public Employees' Retirement Sys. of Mississippi v Merrill Lynch & Co. Inc., 714 FSupp2d 475 (SD NY 2010) and In re Smart Tech., Inc. Shareholder Litig., 295 FRD 50, (SD NY 2013), the Underwriter Defendants argue that the class relating to claims brought under Section 12(a)(2) of the 1933 Act should exclude "aftermarket" or "secondary market" purchasers. This argument again must fail given the stage of the proceedings.
Public Employees' Retirement Sys. (like Slack Tech and In re Century) addresses standing, not class certification and is thus inapposite.[FN2]
In re Smart Tech also does not foreclose standing to bring Section 12(a)(2) in this case or require that the class be limited to exclude "aftermarket" or "secondary market" transactions in this case.
In In re Smart Tech., in July 2010, SMART Technologies, Inc. sold 38.83 million shares of Class A Subordinate Voting stock in both the United States and Canada. In the U.S., the shares were sold pursuant to offering documents (the SMART Offering Documents) filed with the Securities and Exchange Commission (the SEC). In Canada, the shares were sold pursuant to a separate prospectus that was required by the Ontario Securities Act (the Canada [*7]Documents) — i.e., not the SMART Offering Documents. 
Both the Canada Documents and the SMART Offering Documents were filed with the SEC and all 38.83 million shares were registered with the SEC. After the initial public offering, SMART shares were listed on both the NASDAQ and the Toronto Stock Exchange (the TMX) and all of the shares could be sold on either the NASDAQ or the TMX. 
In November 2010, SMART issued its second-quarter results which contained a corrective disclosure addressing certain alleged misstatements and omissions in the SMART Offering Documents. With respect to the claims brought under Section 12(a)(2), the defendants argued that the class should be limited to exclude extraterritorial purchases and should exclude "secondary market" or "after market" purchasers — i.e., that only purchasers in the IPO and not "aftermarket" or "secondary market" purchasers had standing to maintain a Section 12(a)(2) claim. The court (Forrest, J.) limited the class to purchasers of SMART stock in the July 2010 IPO and excluded extraterritorial purchases either in the Canadian offering or on the TMX because no viable claim lied under the 1933 Act with respect to those claims. In addition, the court excluded "aftermarket" and "secondary market" purchasers noting Section 12(a)(2)'s requirement that standing requires purchase "by means of a prospectus or oral communication" (In re Smart Tech., 295 FRD at 57, citing In re IndyMac Mortgage-Backed Sec. Litig., 2012 WL 3553083, at * 4 [SD NY 2012], citing Gustafson v Alloyd Co., Inc., 513 US 561, 578 [1995]) and otherwise noting that the "[p]laintiff did not address the defendants' assertion in this regard" (In re Smart Tech., 295 FRD at 57 n 12). While that exclusion was appropriate in In re Smart Tech., that case does not stand for the broad proposition that "aftermarket" or "secondary market" purchasers always or necessarily lack Section 12(a)(2) standing. As the Second Circuit has held, the key question is whether the transaction at issue was "by means of a prospectus or oral communication" as required by Section 12(a)(2):
In Yung, the Second Circuit interpreted Gustafson to establish the rule that "Section 12(a)(2) liability cannot attach unless there is an 'obligation to distribute a prospectus'...." Id. at 149 (quoting Gustafson, 513 U.S. at 571, 115 S.Ct. 1061). Because the private transaction at issue in Yung was not subject to the prospectus delivery requirements of the Securities Act, the court concluded that no Section 12(a)(2) liability could be found. Id. at 146. In so holding, the court established that the relevant inquiry in determining whether Section 12(a)(2) liability could attach was whether the sale of the security carried with it the legal obligation to provide a prospectus. See id. at 148—49. This is consistent with the language of Section 12(a)(2) itself, which "draws no express distinction between shares purchased in the initial distribution and shares purchased in the aftermarket," but instead requires that "a plaintiff have purchased a security, from a seller, pursuant to a misleading prospectus." Feiner v. SS & C Techs., Inc., 47 F.Supp.2d 250, 252 (D.Conn.1999) (citing 15 U.S.C. § 77l)
(In re Giant Interactive Group, Inc. Sec. Litig., 643 FSupp2d 562, 574 [SD NY 2009], citing Yung v Lee, 432 F3d 142, 146-149 [2d Cir 2005]). 
Here, based on this Second Circuit precedent and as discussed above, the nature of how the Underwriter Defendants distributed the shares, and the dispute over when corrective disclosures were made mandate that this argument fails at this stage. To be sure, it is generally true that purchasers in the "aftermarket" have difficulty establishing that they purchased "by means of a prospectus or oral communication" containing material misstatements or omissions (In re Smart Tech., Inc., 295 FRD at 57; In re Giant Interactive Group, Inc. Sec. Litig., 643 [*8]FSupp2d 562, 574 [SD NY 2009]). But, in this case the Conflicted Defendants allegedly retained shares under their swap agreements such that those shares were sold during and after the SPOs closed and those Conflicted Defendants may well have sold those shares "be means of a prospectus or oral communication" containing material misstatements and omissions. That is a question of fact that cannot be determined at this stage. Accordingly, and as discussed above, it would be premature and inappropriate to exclude claims based on purchases in the "aftermarket" or "secondary market" at this stage. For the avoidance of doubt, based on Plaintiffs' allegations, those claims would have common questions of law and fact with the putative class. As discussed above, this is particularly true because it is unclear whether the alleged corrective press coverage that occurred on or about March 26, 2021 actually addressed and resolved all of the deficiencies in the Offering Documents. Lastly, pending review of the Plaintiffs' proposed tracing methodology, individual tracing as to these transactions would not dominate the litigation. Also, and for the avoidance of doubt, upon a proper factual showing, the Court may at a later date exclude from the class any "aftermarket" or "secondary market" purchaser where there was no obligation to deliver a prospectus. Again, that determination is not for this stage of the proceedings.
The Court has considered the parties' remaining arguments and finds them unavailing.
It is hereby ORDERED that the Plaintiffs' motion (Mtn. Seq. No. 013) to certify a class is granted.
Dated: January 4, 2024
Andrew Borrok, J.S.C.

Footnotes

Footnote 1: As discussed in the Prior Decision, the Conflicted Defendants had entered into certain swap agreements with respect to a portfolio of securities which included Viacom stock with Archegos (id, at 15-16).

Footnote 2: In Public Employees' Retirement Sys., the court (Rakoff, J.) granted the defendants' motion to dismiss the Section 12(a)(2) claims without prejudice, holding that the "coy" allegation that "'the [p]laintiffs and other Class members purchased or otherwise acquired Certificates pursuant and/or traceable to the alleged defective Prospectus Supplements" (714 FSupp2d at 484) was insufficient to even satisfy FRCP Rule 8(a) to properly allege standing.