[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Culver v. Indus. Comm.*, Slip Opinion No. 2025-Ohio-1612.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-1612

THE STATE EX REL. CULVER, APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO, ET AL., APPELLANTS.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Culver v. Indus. Comm.*, Slip Opinion No. 2025-Ohio-1612.]

*Workers' compensation—Violation of specific safety requirements—Former Adm.Code 4123:1-5-17(F) and 4123:1-5-18(C)—Industrial Commission did not abuse its discretion in denying additional award—Record contained some evidence supporting Industrial Commission's finding that nitrogen is not "toxic" and is not a "poison"—Court of appeals' judgment granting writ of mandamus reversed.*

(No. 2024-0595—Submitted January 7, 2025—Decided May 7, 2025.)

APPEAL from the Court of Appeals for Franklin County,

No. 22AP-292, 2024-Ohio-1138.

_____

The per curiam opinion below was joined by KENNEDY, C.J., and FISCHER,

DeWine, Deters, Hawkins, and Shanahan, JJ. Brunner, J., dissented, with an opinion.

**Per Curiam.**

{¶ 1} Kenneth Ray Jr. died as the result of an industrial accident. His widow, appellee, Sharmel Culver, was awarded death benefits. Culver applied for an additional award, alleging that Ray's employer, appellant TimkenSteel Corporation, had committed several violations of specific safety requirements ("VSSR"). Appellant Industrial Commission of Ohio denied Culver's application because she did not establish that the specific safety requirements in effect at the time of Ray's death applied to his industrial accident. Culver brought this action asking the Tenth District Court of Appeals for a writ of mandamus directing the commission to reverse its decision. The Tenth District determined that the commission abused its discretion and issued a limited writ returning the matter to the commission to engage in the remainder of the VSSR analysis. The commission and TimkenSteel appealed. We reverse the Tenth District's judgment.

## I. BACKGROUND

### A. TimkenSteel Accepts Culver's Claim for Death Benefits

{¶ 2} TimkenSteel employed Ray as a security guard. As part of his job duties, he was responsible for conducting safety checks and inspecting fire extinguishers. On the day of the accident—March 20, 2016—Ray inspected the fire extinguishers in an elevator-control room at a TimkenSteel facility. The room was pressurized, or sealed, to prevent contaminants from entering and interfering with the machinery. An air-handling unit installed below the elevator-control room filtered outside air and circulated purified air into the room. The unit contained a pulse-cleaning system, which used bursts of compressed nitrogen gas to dislodge debris from the filter. Culver's complaint alleged that the system paused air circulation for less than a second at regular intervals.

2

{¶ 3} Unknown to anyone at the time, the pulse-cleaning system had malfunctioned and was continuously releasing nitrogen gas into the air-handling unit, thereby displacing the oxygen in the elevator-control room. As a result, Ray died of asphyxiation seconds after he entered the room and the door closed behind him. It was later determined that the air in the room had contained only 4.7 percent oxygen—well below the undisputed dangerous threshold of 19.5 percent oxygen. TimkenSteel, a self-insuring employer, accepted Culver's claim for death benefits.

**B. Culver Files a VSSR Application for an Additional Award**

{¶ 4} In January 2017, Culver applied for an additional award under the claim, alleging that TimkenSteel's violation of specific safety regulations caused Ray's death. Specifically, Culver alleged that TimkenSteel failed to comply with the requirements found in Adm.Code 4123:1-5-17(F) (respiratory protection), 4123:1-5-18(C) (control of air contaminants), 4123:1-5-18(E)(2) through (4) (exhaust systems–structural requirements), and 4123:1-5-22 (confined spaces). TimkenSteel requested a record hearing, and the matter was referred to the Bureau of Workers' Compensation Safety Violations Investigation Unit.

{¶ 5} Following the investigation, in November 2021, a staff hearing officer ("SHO") for the commission held a hearing on the matter. At the start of the hearing, Culver withdrew her allegations that TimkenSteel had violated Adm.Code 4123:1-5-18(E)(2) through (4) and Adm.Code 4123:1-5-22. The VSSR hearing proceeded on Culver's allegations that TimkenSteel violated Adm.Code 4123:1-5-17(F) by failing to provide Ray with respiratory equipment approved for air contaminants and 4123:1-5-18(C) by failing to minimize his exposure to air contaminants.

{¶ 6} The version of Adm.Code 4123:1-5-17(F) that was in effect on the date of Ray's death provided:

(1) Where there are *air contaminants as defined in rule 4123:1-5-01 of the Administrative Code*, the employer shall provide respiratory equipment approved for the hazard.[1]  It shall be the responsibility of the employee to use the respirator or respiratory equipment provided by the employer, guard it against damage and report any malfunction to the employer. . . .

(2) This requirement does not apply where an effective exhaust system (see rules 4123:1-5-18 and 4123:1-5-992 of the Administrative Code) or where other means of equal or greater protection have been provided.

(Emphasis added.)  2010-2011 Ohio Monthly Record 2-3350 (effective Apr. 10, 2011).

{¶ 7} The version of Adm.Code 4123:1-5-18(C) that was in effect on the date of Ray's death provided:

Where employees are exposed to *hazardous concentrations of air contaminants*, the air contaminants shall be minimized by at least one of the following methods:

(1) Substitute a non-hazardous, or less hazardous material;

(2) Confine or isolate the contaminants;

(3) Remove at or near source;

(4) Dilution ventilation;

(5) Exhaust ventilation; . . .

(6) Using wet methods to allay dusts. . . .

---

1. Adm.Code 4123:1-5-17(F)(1) now provides that the employer "will provide respiratory protection equipment approved for the hazard." 2023-2024 Ohio Monthly Record 2-1759 (effective Feb. 1, 2024).

(Emphasis added.)  2010-2011 Ohio Monthly Record at 2-3353.

{¶ 8} At the time, the Administrative Code defined "air contaminants" as "*hazardous concentrations of* fibrosis-producing or toxic dusts, toxic fumes, toxic mists, toxic vapors, or *toxic gases*, or any combination of them when suspended in the atmosphere."  (Emphasis added.)  Former Adm.Code 4123:1-5-01(B)(4), 2010-2011 Ohio Monthly Record at 2-3304.   And the code defined "hazardous concentrations (as applied to air contaminants)" as "concentrations which are known to be in excess of those which would not normally result in injury to an employee's health."   Former Adm.Code 4123:1-5-01(B)(74), 2010-2011 Ohio Monthly Record at 2-3306.

{¶ 9} Notably, the code did not define either "toxic" or "toxic gases," and the word "toxic" was removed from the definition of "air contaminants" approximately three months after the accident in this case.  *See* former 4123:1-5-01(B)(4), 2015-2016 Ohio Monthly Record 2-4492 (effective June 1, 2016).  Presently, the code defines "air contaminants" as "concentrations of dust, mist, fume, gas or vapor, or any combination thereof when suspended in the atmosphere."  Adm.Code 4123:1-5-01(B)(4).   And the code now defines "hazardous concentrations (as applied to air contaminants)" as "concentrations of air contaminants which are in excess of established occupational exposure limits."  Adm.Code 4123:1-5-01(B)(74).

### C.  The Commission Denies Culver's VSSR Application

{¶ 10} On January 13, 2022, the SHO issued an order denying Culver's VSSR application.  The SHO found that "[n]o evidence ha[d] been presented to substantiate [that] nitrogen gas is a toxic gas.  The evidence presented by the Widow-Claimant expressly indicates nitrogen gas is not toxic."  Accordingly, the SHO determined that neither former Adm.Code 4123:1-5-17(F) nor former 4123:1-5-18(C), both of which dealt with air contaminants, applied to Culver's claim.

{¶ 11} The SHO relied on the following evidence, all of which was obtained through Culver's expert witness, David J. Bizzak, Ph.D., P.E.: (1) a statement in an industry-related article, entitled "Use Nitrogen Safely," that nitrogen gas is "nontoxic and largely inert"; (2) statements published in a Safety Bulletin by the U.S. Chemical Safety and Hazard Investigation Board, entitled "Hazards of Nitrogen Asphyxiation," that "[n]itrogen is not a 'poison' in the traditional sense" and that it "presents a hazard when it displaces oxygen, making the atmosphere hazardous to humans"; and (3) Dr. Bizzak's testimony that nitrogen gas is "nontoxic" but that it is an "air contaminant" because it is a "hazardous chemical." The SHO noted that based on the cited literature, "the air we breathe is composed of approximately 78% nitrogen, 21% oxygen, and other trace components. As nitrogen is the primary component of the air we breathe, it is not per se toxic." The SHO found that the literature and expert testimony presented by Culver "indicate nitrogen gas, in and of itself, is not toxic" and that Culver's "attempt to substitute 'hazardous chemical' as an air contaminant is not permissible."

{¶ 12} Culver's request for a rehearing was denied.

### D.  The Tenth District Grants a Limited Writ of Mandamus

{¶ 13} Culver filed this mandamus action in the Tenth District, seeking a writ that would direct the commission to (1) vacate its order denying her VSSR application, (2) vacate its order denying her rehearing request, and (3) grant her VSSR application. In support, Culver argued that the SHO committed a clear mistake of law "by failing to apply the plain meaning of 'toxic' " and made an "obvious mistake of fact by focusing on the toxicity of nitrogen as it occurs naturally in the air instead of in the concentration [that was] present in the elevator-control room."

{¶ 14} The court of appeals referred the matter to a magistrate, who recommended that the court deny the requested writ. 2024-Ohio-1138, ¶ 56 (10th Dist.). Looking to dictionary definitions of the term "toxic," the magistrate

explained that "toxic is commonly understood to mean having the qualities of, producing the effects of, or resulting from poison, with poison being the commonality between the definitions." *Id*. at ¶ 49. The magistrate noted that the United States Chemical Safety and Hazard Investigation Board's article, "Hazards of Nitrogen Asphyxiation," which was submitted in support of Dr. Bizzak's expert opinion, states that "'[n]itrogen is not a "poison" in the traditional sense.'" *Id*. at ¶ 50. Therefore, applying the "'plain meaning of "toxic"'" as Culver urges, *id.* at ¶ 52, the magistrate concluded that there is "some evidence" in the record to support a finding that nitrogen is not a poison and therefore is not toxic, *id.* at ¶ 50.

{¶ 15} Culver objected to the magistrate's decision, arguing that "air made up of too much nitrogen and not enough oxygen is an 'air contaminant' within the plain meaning of that phrase as it was used in Ohio Adm.Code 4123:1-5-01(B)(4)." The court of appeals sustained Culver's objection, concluding that when Ray entered the elevator-control room, the nitrogen in the room was toxic because of its concentration relative to the oxygen in the room. *Id*. at ¶ 20-23.

{¶ 16} The court of appeals' decision was premised on its view that "toxic" is "a characteristic intrinsically linked to its concentration" and that "a substance can be both beneficial in appropriate quantities but harmful in excess, an understanding that manifests in the definition provided by former Ohio Adm.Code 4123:1-5-01(B)(4) and (74)." *Id*. at ¶ 19. In reaching that determination, the court of appeals quoted from and relied on *Watkins v. Affinia Group*, 2016-Ohio-2830 (8th Dist.), a case in which the meaning of "toxic" was considered as it relates to tort law. *See* 2024-Ohio-1138 at ¶ 19-20. Thus, the court of appeals held that the SHO erroneously found that nitrogen is not an air contaminant, because the SHO "added a requirement to the definition of 'air contaminants' that requires a claimant to prove a gas is 'per se' toxic, ignoring the rule's consideration of relative concentration in its own definition." *Id*. at ¶ 21. Because the SHO concluded that nitrogen is not an air contaminant and did not complete the VSSR analysis, the

court of appeals granted a limited writ of mandamus returning the matter to the commission with instructions to engage in the remainder of the VSSR analysis. *Id.* at ¶ 22-23.

{¶ 17} The commission and TimkenSteel have each appealed as of right.

## II. STANDARDS OF REVIEW

### A. Mandamus Standard

{¶ 18} An order denying an application for an additional award for a VSSR is not appealable under R.C. 4123.512(A) and must be challenged in a mandamus action. *See State ex rel. B & C Machine Co. v. Indus. Comm.*, 1992-Ohio-75, ¶ 10. To obtain a writ of mandamus, Culver must show by clear and convincing evidence that she has a clear legal right to the requested relief, that the commission has a clear legal duty to provide that relief, and that she has no adequate remedy in the ordinary course of the law. *State ex rel. Zarbana Industries, Inc. v. Indus. Comm.*, 2021-Ohio-3669, ¶ 10. In a direct appeal of a mandamus action originating in a court of appeals, we review the judgment as if the action had been originally filed here. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141, 164 (1967).

{¶ 19} A writ of mandamus may lie when there is a legal basis to compel the commission to perform its duties under the law, when the commission has misinterpreted a statute, or when the commission has abused its discretion in carrying out its duties. *State ex rel. Gen. Motors Corp. v. Indus. Comm.*, 2008-Ohio-1593, ¶ 9. Ordinarily, "[w]here a commission order is adequately explained and based on some evidence, even evidence that may be persuasively contradicted by other evidence of record, the order will not be disturbed as manifesting an abuse of discretion." *State ex rel. Mobley v. Indus. Comm.*, 1997-Ohio-181, ¶ 16.

### B. VSSR Standard

{¶ 20} "No employer shall violate a specific safety rule adopted by the administrator of workers' compensation pursuant to section 4121.13 of the Revised Code or an act of the general assembly to protect the lives, health, and safety of

employees pursuant to Section 35 of Article II, Ohio Constitution." R.C. 4121.47(A). An award for a VSSR is "a new, separate, and distinct award" paid by the employer directly. *State ex rel. Newman v. Indus. Comm.*, 1997-Ohio-62, ¶ 7. The award is "over and above" the standard workers' compensation benefits and is not covered by an employer's workers' compensation premium. *Id.*

{¶ 21} To succeed on a VSSR claim, the claimant must prove that (1) an applicable and specific safety requirement was in effect at the time of the injury, (2) the employer failed to comply with the requirement, and (3) the failure to comply proximately caused the injury. *State ex rel. Scott v. Indus. Comm.*, 2013-Ohio-2445, ¶ 11. Article II, Section 35 of the Ohio Constitution directs that the "board shall have full power and authority to hear and determine whether or not an injury, disease or death resulted because of the failure of the employer to comply with any specific requirement for the protection of the lives, health or safety of employees, enacted by the general assembly or in the form of an order adopted by [the] board, and its decision shall be final . . . ."[2] Factual questions relevant to proof of a VSSR claim rest exclusively within the commission's discretion. *Scott* at ¶ 12.

{¶ 22} A VSSR award "is in the nature of a penalty, and it was the purpose of the Constitution to impose such penalty upon the employer who failed to comply, and not upon him who did comply." *State ex rel. Whitman v. Indus. Comm.*, 131 Ohio St. 375, 379 (1936). It is therefore imperative that a safety requirement be specific enough to plainly apprise an employer of its legal obligations toward its employees. *State ex rel. Double v. Indus. Comm.*, 1992-Ohio-39, ¶ 18. "[A]n employer should not have to speculate as to whether it falls within the class of employers to whom a specific safety requirement applies." *Id.*

---

2. The "board" referred to in Article II, Section 35 is the State Liability Board of Awards, which was superseded in 1913 when the General Assembly created the Industrial Commission. *See State ex rel. Engle v. Indus. Comm.*, 142 Ohio St. 425, 429 (1944), citing Am.S.B. No. 137, 103 Ohio Laws 95.

### III. ANALYSIS

{¶ 23} The relevant facts in this case are largely undisputed. The parties agree that the atmosphere in the elevator-control room caused Ray's death by asphyxia. The question presented by this appeal is whether the commission abused its discretion in finding that Adm.Code 4123:1-5-17(F) and 4123:1-5-18(C) are not applicable to the industrial accident that occurred here.

{¶ 24} The SHO found that Culver did not present evidence to substantiate that nitrogen is a "toxic gas." The court of appeals found that this was an abuse of discretion because the SHO (1) added a "per se" requirement to the definition of "air contaminants" and (2) "ignor[ed] the rule's consideration of relative concentration in its own definition." 2024-Ohio-1138 at ¶ 21 (10th Dist.).

### A. Whether the SHO Committed Legal Error

{¶ 25} On appeal, the commission first contends that the SHO "did not add any legal requirement that nitrogen be 'toxic per se' but rather only used the phrase 'per se' to summarize the scientific evidence presented." We agree. In her findings following the November 2021 VSSR hearing, after referencing the articles provided by Culver's expert witness, the SHO stated, "This literature also indicates the air we breathe is composed of approximately 78% nitrogen, 21% oxygen, and other trace components. As nitrogen is the primary component of the air we breathe, it is not per se toxic." The phrase "per se" was used by the SHO to summarize the evidence and to make findings of fact based on that evidence.

### B. Whether the Court of Appeals Committed Reversible Error

{¶ 26} The commission further asserts that the court of appeals "exceeded its role by substituting its own opinion of the evidence and improperly re-weighed the evidence." Relatedly, TimkenSteel contends that the court of appeals committed reversible error by "implicitly remov[ing] the requirement that a gas first be proven to be toxic before considering whether it is present in a hazardous concentration."

10

**{¶ 27}** Culver responds that there is no requirement "to examine inherent toxicity *before* a hazardous concentration analysis becomes necessary." (Emphasis added.) Perhaps so. However, a determination whether a gas is "toxic" must be made even if it is first determined that a "hazardous concentration" of that gas was present. To hold otherwise would render the word "toxic" meaningless. If the regulations were meant to protect employees from hazardous concentrations of *all* gases, there would be no need for former Adm.Code 4123:1-5-01(B)(4) to include the word "toxic."

**{¶ 28}** We rejected an argument similar to Culver's in *State ex rel. Gilbert v. Indus. Comm.*, 2007-Ohio-6096. In *Gilbert*, the dispute was whether an employee's occupational disease was caused by a "hazardous concentration" of chemicals in the atmosphere. *Id*. at ¶ 5-9. We summarized the employee's position as essentially this: "I have an occupational disease due to chemical exposure; ergo, the level of exposure was hazardous." *Id*. at ¶ 19. However, the definition of "hazardous concentrations" in effect at that time described only concentrations that would not "normally" cause injury. *See* former Adm.Code 4123:1-5-01(B)(74), 2003-2004 Ohio Monthly Record 1244 (effective Nov. 1, 2003). We rejected the employee's position, explaining that "[t]he presence of an occupational disease does not necessarily establish that hazardous concentrations of contaminant existed, since a person may have contracted an occupational disease because of abnormal sensitivity to *or* because of hazardous concentrations of a contaminant." (Emphasis added.) *Gilbert* at ¶ 19. "Inherent in the use of this word ['normally'] is the recognition that some persons may have an abnormal sensitivity to a given substance, for which the employer could not be held accountable." *Id*.

**{¶ 29}** Here, Culver labors under the same faulty logic that we rejected in *Gilbert*. Culver's position is essentially that Ray died because of a hazardous concentration of nitrogen gas in the atmosphere; ergo, nitrogen gas is an "air contaminant." But the definition of "air contaminant" in effect at the time of Ray's

death included only "toxic" gases, former Adm.Code 4123:1-5-01(B)(4), 2010-2011 Ohio Monthly Record at 2-3304. Inherent in the use of the qualifying term "toxic" is the recognition that some gases are *not* toxic, for which the employer cannot be held accountable under these specific regulations. Culver's position demands that an employer's responsibilities under former Adm.Code 4123:1-5-17(F) and 4123:1-5-18(C) are triggered when a hazardous concentration of *any* gas is present. This may be true of the regulations as they exist today. *See* Adm.Code 4123:1-5-01(B)(4) (defining "air contaminants," in part, as "concentrations of . . . gas . . . when suspended in the atmosphere"). But it does not align with the regulatory language as it existed at the time of Ray's death. *See* former Adm.Code 4123:1-5-01(B)(4), 2010-2011 Ohio Monthly Record at 2-3304 (defining "air contaminants," in part, as "hazardous concentrations of . . . toxic gases . . . when suspended in the atmosphere").

{¶ 30} The court of appeals took issue with the SHO's reasoning, explaining, "The SHO, presumably comparing nitrogen to other gases, found that nitrogen, 'in an of itself, is not toxic.' . . . But, again, that presumes there are gases that are toxic in any quantity and in any environment, in contrast to the manner in which nitrogen is dangerous." 2024-Ohio-1138 at ¶ 20 (10th Dist.). But by doing so, the court overstated the concept, which it adopted from a products-liability case, that *any* substance may be toxic in excess, *id*. at ¶ 19, citing *Watkins*, 2016-Ohio-2830, at ¶ 27-28 (8th Dist.). This resulted in the court focusing on the "toxic level of a substance" and whether a substance is "toxic due to its concentration," *id*. at ¶ 20, which are not phrases that appear in the former definition of "air contaminants." Accordingly, we conclude that the court of appeals erred by adding a "relative concentration" consideration to the definition of "air contaminants," *see id.* at ¶ 21.

{¶ 31} A better assessment of the former definition of "air contaminant" is found in the following observation from the magistrate's decision:

12

There was evidence in this matter that nitrogen is nontoxic, though hazardous in concentrations where it displaces oxygen, thereby leading to unsafe levels of oxygen. Defining "toxic gas" to include "high or hazardous concentrations of a nontoxic gas" gives rise to a redundant and absurd result with respect to the definition of "air contaminants" under [former] Ohio Adm.Code 4123:1-5-01(B)(4). . . . The text of the rule is not ambiguous and must therefore be applied as written.

*Id*. at ¶ 53.

### C. Whether "Some Evidence" Supports the SHO's Order

{¶ 32} Finally, TimkenSteel asserts that the SHO "did not abuse its discretion by finding that [Culver] failed to prove nitrogen is a toxic gas . . . because its decision was based on some evidence."

{¶ 33} Because a VSSR award is punitive in nature, we have often said that all reasonable doubts regarding the applicability of a specific safety requirement are to be strictly construed in the employer's favor. *E.g.*, *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170, 172 (1989).

{¶ 34} Here, the SHO stated that she applied this principle of strict construction in deciding Culver's VSSR claim. The parties do not dispute the propriety of strictly construing specific safety regulations in favor of the employer. Nor do the parties suggest that the former definition of "air contaminants" is ambiguous. Accordingly, we apply the regulatory text as written. *See In re Application of Alamo Solar I, L.L.C.*, 2023-Ohio-3778, ¶ 14 ("If the text of a regulation is clear, then we apply it as written and stop right there. But if we determine that the text is ambiguous, we may consider the board's interpretation only for its persuasive power."); *see also TWISM Ents., L.L.C. v. State Bd. of*

*Registration for Professional Engineers & Surveyors*, 2022-Ohio-4677, ¶ 44 ("an administrative interpretation should never be used to alter the meaning of a clear text").

{¶ 35} Again, relevant here is former Adm.Code 4123:1-5-01(B)(4), which established that "air contaminants" are "hazardous concentrations of . . . toxic gases . . . when suspended in the atmosphere." 2010-2011 Ohio Monthly Records at 2-3304. When a term in an administrative rule is undefined—indeed, "toxic" is not defined here—we give the term its plain and ordinary meaning. *See State ex rel. Brilliant Elec. Sign Co. v. Indus. Comm.*, 57 Ohio St.2d 51, 54 (1979). "In determining the plain and ordinary meaning of a word, courts may look to dictionary definitions of the word as well as the 'meaning that the word[] ha[s] acquired when . . . used in case law.'" (Bracketed text and ellipsis in original.) *State v. Bertram*, 2023-Ohio-1456, ¶ 13, quoting *Rancho Cincinnati Rivers, L.L.C. v. Warren Cty. Bd. of Revision*, 2021-Ohio-2798, ¶ 21.

{¶ 36} The plain and ordinary meaning of "toxic" is "[h]aving the character or producing the effects of a poison; produced by or resulting from a poison; poisonous." *Black's Law Dictionary* (12th Ed. 2024); *see also Webster's Third New International Dictionary* (2002) ("of, relating to, or caused by a poison or toxin"). The plain and ordinary meaning of "poison" is "a substance (as a drug) that in suitable quantities has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organism: a substance that through its chemical action usu. kills, injures, or impairs an organism (strychnine, carbon monoxide)." *Id.*

{¶ 37} There is evidence in the record that nitrogen is not "toxic" and is not a "poison," as those terms are commonly understood. In fact, the SHO relied on the report and testimony of Culver's own expert witness, as well as the industry publications provided by Culver's expert, all of which expressly state or indicate that nitrogen is "hazardous" but "nontoxic." No contrary evidence was presented.

14

Thus, considering the plain and ordinary meaning of "toxic," the SHO's finding that "[n]o evidence has been presented to substantiate [that] nitrogen gas is a toxic gas" is based on "some evidence."

## IV. CONCLUSION

{¶ 38} We conclude that the SHO's denial of Culver's VSSR application was not an abuse of discretion and that the court of appeals erred in concluding otherwise. Because Culver has not established that she is entitled to mandamus relief, we reverse the Tenth District Court of Appeals' judgment.

Judgment reversed.

_____

**BRUNNER, J., dissenting.**

{¶ 39} Kenneth Ray Jr. was tragically killed at work on March 20, 2016, when he entered a pressurized elevator-control room that unbeknownst to him was full of nitrogen gas. His widow, appellee, Sharmel Culver, applied for an additional award for violations of specific safety requirements, claiming that Ray's employer, appellant TimkenSteel Corporation, caused his death by failing to comply with specific safety regulations. The majority holds that those safety regulations did not apply in instances in which employees were exposed to nitrogen gas. I disagree and respectfully dissent.

## APPLICABLE REGULATIONS AND PROCEDURAL HISTORY

{¶ 40} The regulations applicable to Culver's application—and which control in this case—were in effect until June 1, 2016. In relevant part, they provided that when employees were exposed to "air contaminants," the employer was required to provide employees with respiratory equipment or take certain actions to minimize the employees' exposure to such contaminants. *See* former Adm.Code 4123:1-5-17(F), 2010-2011 Ohio Monthly Record 2-3350 (effective Apr. 10, 2011); 4123:1-5-18(C), 2010-2011 Ohio Monthly Record at 2-3352. Regulations constitute a specific safety requirement when they ""forewarn the

15

employer and establish a standard which [the employer] may follow.” ’ ” (Bracketed text in original.) *State ex rel. Precision Steel Servs., Inc. v. Indus. Comm.*, 2015-Ohio-4798, ¶ 17, quoting *State ex rel. G & S Metal Prods., Inc. v. Moore*, 1997-Ohio-137, ¶ 13, quoting *State ex rel. Howard Eng. & Mfg. Co. v. Indus. Comm.*, 148 Ohio St. 165 (1947), paragraph one of the syllabus. Awards for violations of specific safety requirements are provided for in Article II, Section 35 of the Ohio Constitution. *See Howard Eng. & Mfg. Co.* at paragraph one of the syllabus.

**{¶ 41}** The key term at issue for the purposes of this appeal is “air contaminants,” which was defined as “hazardous concentrations of fibrosis-producing or toxic dusts, toxic fumes, toxic mists, toxic vapors, or *toxic gases*, or any combination of them when suspended in the atmosphere.” (Emphasis added.) Former Adm.Code 4123:1-5-01(B)(4), 2010-2011 Ohio Monthly Record at 2-3304.

**{¶ 42}** Appellant Industrial Commission of Ohio denied Culver’s claim for violation of specific safety requirements on the ground that these regulations did not apply to the conditions surrounding Ray’s death. It reasoned that nitrogen gas is not “in and of itself” toxic, which means it was not among the “toxic gases” that constituted “air contaminants,” and thus, TimkenSteel was not required to take the safety precautions required by those regulations. The Tenth District Court of Appeals concluded that the commission’s decision was wrong, however, and granted Culver a limited writ of mandamus directing the commission to vacate its order denying Culver’s claim. 2024-Ohio-1138, ¶ 23 (10th Dist.). The Tenth District’s decision is well-founded and should be affirmed.

## ANALYSIS

### Nitrogen gas is a toxic gas when it displaces a significant amount of oxygen

**{¶ 43}** The term “toxic” means “extremely harsh, malicious, or harmful.” *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com /dictionary/toxic (accessed Apr. 10, 2025) [https://perma.cc/BC58-VKDT]. More specifically, it means a substance “[h]aving the character or producing the effects

16

of a poison; produced by or resulting from a poison; poisonous." *Black's Law Dictionary* (12th Ed. 2024); *see also Webster's Third New International Dictionary* (2002) ("of, relating to, or caused by a poison or toxin").

**{¶ 44}** "Poison" is generally understood to have several possible meanings. The majority identifies one definition: "'a substance (as a drug) that in suitable quantities has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organism: a substance that through its chemical action usu. kills, injures, or impairs an organism (strychnine, carbon monoxide).'" Majority opinion, ¶ 36, quoting *Webster's Third New International Dictionary* (2002). The term "poison" also means "a substance that inhibits the activity of another substance or the course of a reaction or process." *Webster's Third New International Dictionary* (2002).

**{¶ 45}** The nitrogen gas in the elevator-control room where Ray died falls within the second of these definitions of "poison." The record shows that nitrogen gas displaced a significant amount of oxygen in the room. The Tenth District explained that "[b]y the time Mr. Ray entered the sealed control room, the air inside contained 95 percent nitrogen and only 4.7 percent oxygen" and that "[a]ir containing less than 19.5 percent oxygen is considered dangerous to breathe." 2024-Ohio-1138 at ¶ 3 (10th Dist.). The record shows that by displacing oxygen in the room, nitrogen gas inhibited the process through which Ray's body absorbed and used oxygen, causing him to die from oxygen deprivation or asphyxiation. The nitrogen gas in the room was therefore "a substance that inhibit[ed] the activity of another substance or the course of a reaction or process," *Webster's Third New International Dictionary* (2002). Thus, the nitrogen was a "toxic" gas, that is, a gas "[h]aving the character or producing the effects of a poison," *Black's*.

**{¶ 46}** To dispel any doubt about the toxicity of nitrogen gas, we should take notice of the fact that nitrogen gas is now being used in the United States to conduct executions of death-row inmates. Notably, Alabama has executed four

inmates using nitrogen gas since January 2024, while Louisiana has executed one. *See* Associated Press, *Alabama puts man to death in the nation's fourth execution using nitrogen gas* (Feb. 7, 2025), https://www.npr.org/2025/02/07/nx-s1-5289837/alabama-execution-nitrogen (accessed Apr. 10, 2025) [https://perma.cc/PV3D-PZAM]; Sara Cline, Associated Press, *Louisiana puts man to death in state's first nitrogen gas execution*, (Mar. 19, 2025), https://apnews.com/article/execution-louisiana-nitrogen-eb5e7e61ff0875dc7b 68664b42b6e980 (accessed Apr. 10, 2025) [https://perma.cc/MV4W-W68U]. Two other states—Mississippi and Oklahoma—have approved the use of nitrogen gas in executions. *See* Emily Mae Czachor, CBS News, *Louisiana resuming executions after 15 years, issues first protocol for nitrogen hypoxia* (Feb. 12, 2025), https://www.cbsnews.com/news/louisiana-resumes-nitrogen-hypoxia-execution/ (accessed Apr. 10, 2025). And in Ohio, a bill is currently pending in the General Assembly proposing to do the same. *See* 2024 H.B. No. 392.

**{¶ 47}** The majority points to portions of the record indicating that nitrogen gas is "nontoxic and largely inert" and that it is "not a 'poison' in the traditional sense." Majority opinion at ¶ 11. While it is possible that nitrogen gas may not per se fall under the first definition of "poison" noted above—i.e., a substance that causes harm through chemical activity when it contacts or is absorbed by an organism—the majority ignores the inhibition-based definition of poison, even though that definition is provided in the dictionary on which the majority selectively relies for its preferred definition.

**The applicable regulations taken together as a whole define oxygen-displacing gases such as nitrogen as toxic gases**

**{¶ 48}** More fundamentally, the majority neglects to "follow the cardinal rule" that a law "is to be read as a whole" because the meaning of language, "plain or not, depends on context," *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991). While nitrogen gas may be nontoxic in ambient air, the regulations interpreted and

18

applied here do not assume nitrogen's presence in ambient air. Rather, the regulations address air conditions to which an employee may be exposed at work, which, as the present case tragically illustrates, differed greatly from ambient air. Here, Ray was exposed to such a high proportion of nitrogen gas relative to oxygen in the air he breathed in the control room—with no protective gear provided by his employer—that it was impossible for his lungs to absorb the amount of oxygen needed to survive, causing his death in violation of a specific safety requirement for employers to provide protective gear to workers under conditions such as those Ray experienced.

{¶ 49} The regulation requiring employers to provide respiratory equipment offers another important textual clue that the nitrogen gas that caused Ray's death involved a "toxic gas." Former Adm.Code 4123:1-5-17(F) required an employer to provide "respiratory equipment *approved for the hazard*." (Emphasis added.) 2010-2011 Ohio Monthly Record at 2-3350. The code then identified several types of respiratory devices the employer could provide, depending on the hazard presented. One was an "[a]ir-purifying device," defined as "a device which removes contaminants from the atmosphere and [is] *used only in atmospheres containing sufficient oxygen to sustain life* (at least 19.5 per cent by volume at sea level)." (Emphasis added.) Former Adm.Code 4123:1-5-01(B)(110)(a), 2010-2011 Ohio Monthly Record at 2-3308. The others were a "[s]upplied-air device" and a "[s]elf-contained breathing apparatus," former Adm.Code 4123:1-5-01(B)(110)(b) and (c), 2010-2011 Ohio Monthly Record at 2-3308, which supply breathing air from another source and can therefore sustain life in an atmosphere containing insufficient oxygen. These provisions inherently recognized that an employee may be exposed to a low-oxygen environment and that an employer must provide the employee with a respiratory device designed for such an environment. Accordingly, we should hold that oxygen-displacing gases like nitrogen are "toxic gases" under former Adm.Code 4123:1-5-01(B)(4).

**Holding that nitrogen gas is never a toxic gas flies in the face of reason**

{¶ 50} The majority also faults the Tenth District for considering the concentration of a gas when determining whether it falls within the term "toxic gases" under Former Adm.Code 4123:1-5-01(B)(4). The majority first reasons that the word "toxic" is used as a "qualifying term," which conveys a "recognition that some gases are *not* toxic" and therefore was not covered by the term "air contaminants." (Emphasis in original.) Majority opinion at ¶ 29. But even accepting that *some* gases are nontoxic no matter how much of the gas is present, it does not conversely follow that *all other* gases are *toxic in any amount*. This creates an internal inconsistency in the majority opinion, since the opinion defines "toxic" as a "poison," and then defines "poison" as a substance that "'*in suitable quantities* has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organism . . .'" (emphasis added), majority opinion at ¶ 36, quoting *Webster's Third New International Dictionary* (2002). The majority's determination that the appellate court should not have considered the amount of a gas present is oxymoronic, since it pronounces that the correct approach involves considering the amount of a gas present, *see id.*

{¶ 51} The majority—adopting reasoning from the magistrate's decision below—further concludes that whether a gas is toxic *must* be determinable without reference to its concentration, because the term "air contaminants" requires consideration whether a "hazardous concentration[]" of a gas is present. Majority opinion at ¶ 31, citing 2024-Ohio-1138 at ¶ 53 (10th Dist.). When used for interpreting the meaning of "toxic gases," the majority reasons that allowing consideration of a gas's concentration would cause former Adm.Code 4123:1-5-01(B)(4) to contain redundant language. *Id.*, citing 2024-Ohio-1138 at ¶ 53 (10th Dist.).

{¶ 52} This obscure concern emanates from isolated strictures of the rules of legal construction, familiar to judges but likely not to ordinary employees and

managers in Ohio. *See, e.g.*, *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574 (1995) ("the Court will avoid a reading which renders some words altogether redundant"). Using this indistinct rule to force an outcome favoring employers— deeming nitrogen gas per se "nontoxic" despite its being used to execute inmates— flies in the face of reason.

**{¶ 53}** "[S]tandard human communication tends to be full of redundancy and often desirably so." *See* John M. Golden, *Redundancy: When Law Repeats Itself*, 94 Tex.L.Rev. 629, 631 (2016). Moreover, legal devices often include redundancy as a way of providing "overlapping coverage" of a particular subject matter. *Id.* at 636. While it has been argued that redundancy in the law has the "capacity to sow error and confusion," it is also "a justifiably frequent feature of law" that provides a number of important benefits. *Id.* at 710. Redundancy in the law can "reduce uncertainty," *id.* at 663, have a "clarifying effect," *id.* at 664, and "help prevent undesired gaps in legal coverage," *id.* at 665. Ultimately, "the aim of legal decision makers and policy makers, as well as drafters of legal documents, should be not to eliminate or ignore redundancy but to optimize its recognition and use." *Id.* at 711.

**{¶ 54}** We therefore should not reject an interpretation of the term "air contaminants," an obvious interpretation that even makes sense to people not versed in the law, simply because it would involve some degree of redundancy. Using a sleight of hand called "redundancy" to avoid application of plain language is a poor excuse for denying justice to workers whose injuries result in death. We can and should recognize that the term "hazardous concentration" and the plain meaning of "toxic gases" provide relief for fatally injured workers such as Ray. These regulatory terms are not and should not be used to perform "gotcha" jurisprudence based on rules of construction about redundancy. Courts cannot and should not pick and choose among definitions, discarding a possibly philosophically disfavored one as "redundant." Doing so is in clear disregard of

the legislative mandate that R.C. Ch. 4123, Ohio's workers' compensation statutory scheme, "be liberally construed in favor of employees and the dependents of deceased employees," R.C. 4123.95. This court's failure to follow the law undermines public confidence in the judiciary by creating an appearance of favoring employers over unprotected injured workers in the context of violations of specific safety requirements when more than one provision of the applicable regulations points to the conclusion that nitrogen is a toxic gas.

## CONCLUSION

{¶ 55} For these reasons, the Tenth District Court of Appeals correctly granted a partial writ of mandamus. I would therefore affirm its judgment. Because the majority does not, I "strongly and emphatically" dissent, whether or not saying so is redundant.

_____

Karp Steiger Co., L.P.A., and David J. Steiger; and Flowers & Grube, Louis E. Grube, and Kendra N. Davitt, for appellee.

Zashin & Rich Co., L.P.A., and Scott Coghlan, for appellant TimkenSteel Corporation.

Dave Yost, Attorney General, and Natalie J. Tackett, Assistant Attorney General, for appellant Industrial Commission of Ohio.

_____